TRIBLECOCK (WAITE v.). See Case No. 17,046.

TRIBOU, The MARCIA. See Case No. 9,062.

## Case No. 14,171.

### The TRIBUNE.

[3 Sumn. 144.] [1]

Circuit Court, D. Rhode Island. Nov. Term, 1837.

ADMIRALTY — MARITIME CONTRACTS — CHARTER PARTY—MEASURE OF DAMAGES—MASTER.

1. The admiralty has no jurisdiction over preliminary contracts leading to maritime contracts.
[Cited in Cox v. Murray, Case No. 3,304; Peck v. Laughlin, Id. 10,890; Maury v. Culliford, 10 Fed. 390.]

2. The jurisdiction of the admiralty does not depend upon the particular name or character of the instrument, but whether it imports to be a maritime contract.
[Cited in Gloucester Ins. Co. v. Younger, Id. 5,487.]

[1] [Reported by Charles Sumner, Esq.]

3. An agreement for a charter-party to be made at a later period, *held*, under the circumstances, to amount to a present charter-party, notwithstanding a more formal instrument was contemplated.

[Cited in Scott v. The Ira Chaffee, 2 Fed. 402; Maury v. Culliford, 10 Fed. 390.]

4. Where the voyage, commenced under this agreement, was broken up by the ship-owners before its completion, *held*, that the measure of damages, for which they were liable to the other party, was what would be a compensation for the actual loss and expense incurred about the voyage, the labor and services in procuring another vessel, and the reasonable disbursements in the present suit, beyond the taxed costs.

[Cited in The Flash, Case No. 4,857; Stone v. The Relampago, Id. 13,486; Oakes v. Richardson, Id. 10,390; The Baracoa, 44 Fed. 103; Wheelwright v. Walsh, Id. 382.]

5. A person, once master of a vessel, will be deemed to continue in that character, until displaced by some overt act or declaration of the owners.

[Cited in Thomas v. Osborn, 19 How. (60 U. S.) 45; Fox v. Holt, Case No. 5,012.]

6. The power of the master to make contracts about his vessel in the home port of the owners, is limited.

[Cited in The Flash. Case No. 4,857; The Director, 26 Fed. 709.]

[Cited in Botsford v. Plummer, 67 Mich. 271, 34 N. W. 569.]

[Appeal from the district court of the United States for the district of Rhode Island.]

Libel on a memorandum of charter-party.

Ames & Atwell, for libellant.

Rivers, Jr., & Whipple, for claimants.

STORY, Circuit Justice. This is the case of an appeal from a pro formâ decree of the district court, in a cause civil and maritime. The libel is founded on a memorandum of contract, entered into at Bangor, in the state of Maine, on the 23d of November, 1836, by Samuel Dennett, the asserted master of the schooner Tribune, as follows. "I hereby agree, within three days, to be ready at Hampden, with a new suit of sails on the Tribune, to load for T. W. Letson, (the libellant), and proceed without delay to Lubec, to take in what may be wanted to constitute her cargo, and proceed to Havana, and back to any port of the United States; also that the charter-party shall not commence until she is loaded at Lubec, provided I am not detained over seven days in loading said vessel." Then follows the date and the signature of Dennett. On the same paper, immediately below the foregoing memorandum, is the following, signed by T. W. Letson. "I agree to allow said vessel, on said charter-party, five hundred Spanish dollars per month. The charter to be made at Lubec. Bangor, Nov. 23, 1836." It appears, from the evidence, that at the time when this contract was entered into, the libellant had also contracted with the government of the island of Cuba, to supply it with a large amount of lumber of various descriptions, and among other things, with a large number of cedar posts, by the 1st of January, 1837; and the object of the contemplated voyage of the Tribune was, to take a cargo of cedar posts to Havana in fulfilment of this last contract. The Tribune was, at the time of making this contract, owned by the claimants, and belonged to Frankfort, in the district of Belfast, in Maine. She had been employed in the year 1835 in the coasting trade, during what is technically called the coasting season; and afterwards surrendered her coasting license and enrolment, and performed a voyage to the West Indies and back again. In the year 1836, she was again employed in the coasting trade, and at the time of the contract had just terminated her coasting season, and her license and enrolment had been deposited in the custom-house at Frankfort, for the purpose of being surrendered, in order to have the schooner registered for a foreign voyage. During all these periods she was under the command of Dennett, as master, he taking her upon shares, according to the custom of the country, that is, he paying for her victualling, and manning, and other expenses of navigation, and dividing the gross proceeds of her employment equally with the owners; so that each was entitled to a moiety of the gross earnings. Under such circumstances, according to the doctrine maintained by the supreme court of Maine, the master would be entitled to be deemed owner for the voyage, or season of hiring, and, of course, he would be entitled, as such, to let or charter, or otherwise to employ, the vessel. See Thompson v. Snow, 4 Greenl. 264; Emery v. Hersey, Id. 407; Winsor v. Cutts, 7 Greenl. 261. After this memorandum of charter-party was made, a large number of cedar posts, destined on the voyage, were put on board of her at Frankfort by the libellant, under the superintendence of Dennett. But before the schooner sailed on her intended voyage to Lubec, the owners ordered the cargo so laden to be put on shore, and attached it under process, for an asserted debt, due to them on a former voyage by a company, of which they insisted he was either a partner, or an agent; and in either event liable to them. The whole voyage was thereupon voluntarily broken up by the owners; and the libellant was frustrated in his intended enterprise to Lubec and Havana with the schooner. She was subsequently employed in another voyage to the West Indies under the command of Dennett, and on her return was found at Providence; and the present proceedings were there instituted, in the district of Rhode Island, against her.

The first point, which has been made at the bar, and which, indeed, is preliminary in its nature to all other inquiries is, whether the court has jurisdiction sitting in admiralty over this contract. It is not disputed, that courts of admiralty have jurisdiction in cases of charter-parties generally. But the argument

is, that the present contract is not a charter-party for the contemplated voyage; but is a mere preliminary agreement to execute such a charter-party; and, that over preliminary agreements of such a nature, the admiralty court has not, and does not pretend to exert jurisdiction. In support of this objection, the case of Andrews v. Essex Fire & Marine Ins. Co. [Case No. 374], is relied on. I agree to the doctrine contained in that case on this subject. I think, that the admiralty has jurisdiction over maritime contracts generally, but not over preliminary contracts leading to such maritime contracts. And the only remaining point of inquiry is, whether the contract now in controversy is such a preliminary agreement. On the one side it is contended, that the terms of the original instrument signed by Dennett, do not import, that another charter-party is to be executed for the voyage, but only, that the right to the charter compensation is to commence on the loading at Lubec; and, that the words in the other part of the instrument signed by the libellant, "the charter to be made at Lubec," are to be construed as having the same meaning; and that "made" is to be read "commence." On the other side, the claimants contend, that the natural meaning of the latter words is, that the charter-party was to be made or executed at Lubec, and that the commencement of the chartered voyage was to take place upon the loading at that port. In loose instruments of this sort, it is not very easy to say, what precise meaning ought to be attached to words standing in such a connection. The whole of both papers is to be construed together as constituting one contract, and I incline to think, that the better construction on the whole is that for which the claimants contend; and that there was an intention to have a formal charter-party executed at Lubec.

But, admitting this to be the true construction of the two instruments taken together, still it does not follow, that this agreement is to be treated as a mere preliminary contract. It may still be treated as a charter-party, loose and informal, indeed, but as containing in itself the substantial provisions of such an instrument, a definite voyage to be performed on one side, and a definite compensation to be paid therefor by the other side. The making of a mere formal instrument under such circumstances may be treated rather as a farther assurance, than as the inception of a maritime charter-party. Nor is this doctrine at all new, even at the common law. It is not uncommon for agreements to be made for a lease for years, with suitable covenants for the due execution of a future formal lease; and in many cases of this sort, notwithstanding such covenants for a formal lease, the agreement has been held to amount to a present demise, where it seemed better adapted to carry into full effect the intention of the parties. Without going at large into the cases, it is sufficient to cite on this very point

the case of Warman v. Faithfull, 5 Barn. & Adol. 1042; where it was established, that an agreement for a lease for a definite period, for a fixed rent, amounted to a present demise, notwithstanding a more formal instrument was to be executed, upon the intelligible ground, that it best carried into effect the apparent intention of the parties. Upon a similar ground, I think the present instrument might well be construed to amount to a charter-party for the voyage, loose indeed, and informal, notwithstanding a more formal instrument of the same nature was contemplated. But I do not rest my opinion upon this point; because there is another view of the matter, which is conclusive. It is manifest, that, so far as the voyage from Frankfort to Lubec was concerned, (a voyage necessarily maritime and for no inconsiderable distance on the high seas) no farther or more formal paper was within the contemplation of the parties. The cargo for this part of the voyage was actually taken on board, and the voyage was voluntarily broken up at Frankfort by the claimants. Under these circumstances, it seems to me, that the jurisdiction already attached, as the voyage was maritime, and the contract was maritime. The question of jurisdiction in cases of this sort does not depend upon the particular name or character of the instrument, but whether it imports to be a maritime contract or not.

The next objection is, that Dennett was not master of the vessel at the time; and if he was, that he had no authority to make the contract. I am of opinion, that he was master. He had been master for a whole year before; and his name stood on the ship's papers as master. Being once master, he must be deemed still to continue to hold that character, until some overt act or declaration of the owners displaced him from the station. There is no proof of that. As far as the evidence goes, it is directly the other way. He took on board this very cargo at Frankfort, as master. He made the very contract in question, as master. Nay, he has continued ever since in the vessel as master, to the commencement of the present suit. His own testimony does not deny this; though I must say, that I am sorry to say, that it contains some pitiful evasions, and some statements, which, looking to the other facts in evidence, I cannot entirely credit. As to his right to make such a contract in the home port of the owners, I agree, that it cannot be ordinarily presumed from his character as master. It is not an incident to his general authority; nor can it be presumed, under such circumstances, as an ordinary superadded agency. But there are peculiar circumstances, however, in the present case, which do create some presumption of such a superadded agency. In the first place, such had been his authority in the former voyages of the vessel; and such seems also to have been his authority

under her subsequent employment. And I think it might fairly be presumed, that in the home port he would scarcely have had the rashness to make so important and definitive a contract without some authority. I am aware that he has sworn that the contract was made by him conditionally, if his owners approved of it. But no such condition appears on the instrument itself; and I cannot but think, that the attendant circumstances discredit it. How are we to account for the fact, that the cargo was taken on board by him under the contract, in the course of some two or three weeks; and yet, that all this time he acted without authority; nay, that the owners disapproved of it? But I go farther, and am of opinion, that there was an adoption of the contract by Mr Parker, one of the owners, and the ship's husband and managing owner, upon a full knowledge of the proceedings of the master. He lived in the neighborhood; he must have seen the cargo taken on board; for he had the immediate superintendence of the vessel in the home port. He suffered the cargo to be loaded without objection, or giving any notice of objection to the libellant. He was present, when conversations were had between the libellant's agent and the master on the subject of the voyage; and yet he made no objection. The testimony of Mr. Lord appears to me directly to establish the full knowledge of Mr. Parker of the voyage, and his full assent to it. It is true, that the master has sworn, that the owners never did assent to the contract. But his testimony is completely outweighed on this very point by that of Mr. Ames and Mr. Cheesborough. Without going into a particular commentary upon all the testimony, I cannot doubt, that the contract of the master was fully adopted by the owners; and that it was broken off afterwards upon other considerations, wholly aside from the objections now insisted on.

The only remaining question is as to the damages. I have no doubt, that the expected profits to be made on the voyage, and the supposed injury to the libellant, from his inability to comply punctiliously with his contract with the government of Cuba, are not proper items of damage. The due performance of the voyage was subject to many future contingencies; and the item of profits is too uncertain in its nature to form any basis of damages, even if, in a case like the present, there were not other objections to it. I think, too, that in the present action no allowance can be made in the damages for the alleged loss of the cedar posts, which were attached. If rightly attached, then the libellant has sustained no damage. If wrongly attached, his proper remedy is in a court of common law, in an action of trover for an illegal conversion. Certainly the loss of these posts is not in any view a legitimate consequence of the refusal of the owners to proceed on the voyage. All that the libellant seems fairly entitled to is a compensation for his actual losses and expenses incurred in and about the voyage, and for his labor and services in procuring another vessel, and his reasonable disbursements, in vindicating his rights in the present suit, beyond what he will receive an indemnity for in the regular taxed costs. Upon a full consideration of all the circumstances in evidence, it seems to me that the libellant ought to recover the sum of two hundred and fifty dollars, and his costs of suit.