## Case No. 5,012.

### FOX et al. v. HOLT et al.

[4 Ben. 278;[1] 36 Conn. 558.]

District Court, D. Connecticut. July 27, 1870.

D. Chadwick and A. P. Hyde, for libellants.

S. L. Warner, for respondents.

SHIPMAN, District Judge. This was a libel in personam against the respondent Holt, as master, and both the respondents, as owners of the schooner Daniel Russell, a domestic vessel, belonging to Portland, in the state of Connecticut, within the collection district of Middletown, and registered at the latter port. The suit is to recover damages for the breach of a contract of affreightment, in the failure to deliver a part of a cargo of coal shipped at Rondout, in the state of New York, and to be delivered at Deep River, in the state of Connecticut. The amount in controversy is not

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

large, but the principles involved are of interest to persons owning, navigating, and dealing with domestic vessels employed in the coasting trade. As the facts in the case are peculiar, a somewhat extended statement of them may be useful.

The Daniel Russell is one of a number of vessels owned in great part by the Middlesex Quarry Company, a corporation located at Portland, and engaged in quarrying stone, and delivering the same at various ports beyond the limits of this state. The quarry company own fifteen-sixteenths of this schooner, and, on the 10th of March, 1865, Holt became the owner of one-sixteenth, by bill of sale from one White. On the same day a new enrollment was taken out of the collector's office at Middletown, in which Holt is described as master. He took charge of her as such, and the answer admits that he continued as master down to about the 30th of January, 1868. The bill of lading of the cargo was signed by him on the 31st of March, 1868. The quarry company deny that he was master at the latter date, and also that he signed the bill of lading as master. On the facts before the court, he must be deemed master on the day the bill of lading was signed. He had been master for several years preceding this contract. "Being once master, he must be deemed still to hold that character, until some overt act or declaration of the owners displaced him from that station." The Tribune [Case No. 14,171]. He is described in the enrollment as master. "The enrollment is evidence of what it declares at the time it was made, and it may be presumed that the same facts exist until a change is shown." Jordan v. Young, 37 Me. 276, 280. Of course, neither the fact that a person was master at a particular time, nor that he is so described in the enrollment, or any other of the ship's papers, is conclusive evidence that he was so at any subsequent date, however little remote. If he was afterwards displaced, the fact can be shown. In order to effectually displace him, so that he can no longer bind the vessel or owners, it is not necessary that his formal discharge should come to the actual knowledge of others. If he is legally deprived of his command, and disconnected from the ship, that determines his authority. If he is legally discharged, but in fact continues in command, he is a mere usurper, and all persons having knowledge of his discharge are bound by it, and can make no contract with him binding on the ship or owners. But there is no evidence, in this case, that Holt was discharged from the command of the Daniel Russell prior to his receiving this cargo on board, under this bill of lading. It is true, the quarry company have proved the following vote, passed by them March 10th, 1868: "Voted, to discharge H. B. Holt from the captaincy of schooner Daniel Russell, unless he pays $200 on what he now owes this company." But this vote is both conditional and vague. It was not a discharge, but a mere threat that he would be discharged, unless he should pay two hundred dollars on his indebtedness. When he was to pay that amount, in order to save his place, the vote does not specify. This vote was never communicated to these libellants, or at least, not till this cargo was received on board the schooner at Rondout. There was a correspondence between Holt and the quarry company's agent, about the subject matter of this vote, but there was no overt act, or declaration to the world, by either, which could bind third parties. Indeed, the only material fact proved, bearing on this point, is this conditional discharge, until the schooner had arrived at her port of destination with the coal on board, when, before the delivery of any part of it, Holt was discharged absolutely, and displaced from his station. Until this latter act, he must be deemed to have been master.

The objection that he did not sign the bill of lading, as master, is untenable. He described himself, in the body of the instrument, as master, and signed the same with his own name. The fact that he did not add the word "master" to his signature is of no importance. If he was in fact master, with the authority to contract for the delivery of the cargo, and the latter was laden on board, the vessel and owners would be liable in case of a breach of the agreement, even had there been no bill of lading signed. "It is the fact, that the goods are shipped, and not the written acknowledgment of it,—the obligation to carry them safely, and not the written contract,—that creates the liability and fixes the jurisdiction of the court." Ben. Adm. § 286; The Peytona [Case No. 11,058]. Of course, I am here speaking of the contract, in its ordinary legal aspect, to carry and deliver this cargo laden on board, and not the peculiar agreement in relation to the mode of payment, which the libellants rely on to support the main feature of their claim. The cargo was in fact laden on board, the voyage performed, and a portion of it actually delivered. The question whether the owners are liable for the non-delivery of the remainder, would be the same, if there had been no bill of lading at all. The pertinent enquiry here is, not what was the form of the bill of lading, but whether Holt was master of the vessel, and thus had the authority to receive the coal on board, and bind the vessel and owners to transport and deliver it.

I now come to the more important part of this controversy, in reference to which, a detail of the facts is necessary, in order to properly present the questions which arise. The primary business of this schooner was transporting stone from Portland, to ports out of this state. In addition to this, she was, unless ordered home light by the agent of the quarry company, accustomed to take return cargoes, and deliver them at other ports. These return cargoes were not always taken from the ports, at which the stone was delivered, but often from other places. The port

of delivery of a return cargo was not often, or at least not always, on the direct route of the voyage home, and, of course, a deviation from that route was sometimes made. The master had been accustomed to make and execute contracts of affreightment for these return voyages. His last trip down, before the close of navigation on Connecticut river, was from Portland to New York. He delivered his cargo of stone at the latter place, and not being ordered home light, went a short distance up the Hudson river, to Cold Spring, after a load of iron, to be taken to Fall River, in Massachusetts. The cold weather caught the schooner at Cold Spring, where she was frozen in, and laid up for the winter, or till she should be released by a thaw. The mate was left in charge as shipkeeper, and the captain returned home to Deep River in this state, where he and the libellants reside, and remained there through the winter.

The practice of the captain, to take return cargoes in the manner stated, was well known to the agent of the quarry company. He testified on the hearing, that Capt. Holt had taken the schooner up the Hudson river, in the summer of 1867, for freight. It is true, he added, that it was stupid for him to take her there, at the time he did, in December of that year. But that error in judgment could in no way affect third parties, dealing with the schooner through the master. That was a question between the master and owners alone. This practice of the master, to take return cargoes in the manner already stated, permitted as it was by the owners, made his schooner a general freighting vessel, so far as these return freights are concerned, and, as to them, the master, in judgment of law, must be deemed clothed with the ordinary powers of masters of general freighting vessels. No private instructions from the quarry company to him, could abridge these powers, so far as third persons, without notice, are concerned.

While the vessel was thus frozen in, at Cold Spring, and the master was at home, at Deep River, sometime during the latter part of the winter, he agreed with the libellants to bring the load of coal in question from Rondout to Deep River, provided he could get released from his Fall River engagement. On the 31st of March, 1868, at Rondout, and while in the actual possession and command of the vessel, he received the coal on board, signed the bill of lading, and sailed for Deep River, where he arrived on or about the 6th of April. While at the latter place, and before any part of the cargo was delivered, he was, as already stated, displaced from the command of the vessel, by the quarry company, and another master put in charge. The latter offered to deliver the coal to the libellants, provided they would pay the freight. The libellants declined to pay the freight, but offered to give security to pay, if they were liable. Of the peculiar character of this offer of security I shall have occasion to remark here-after. The master, acting under the direction of the quarry company, declined to accept it. Then commenced a correspondence, and a series of manoeuvres by the parties, which need not be detailed here, as they are of no importance in settling the legal questions in this case. The libellants continued to demand the coal, and finally, on or about the 20th of April, the master delivered, and the libellants received, all the cargo except thirty-seven tons, which he declined to deliver until the freight was paid. The libellants demanded the whole, and renewed the offer of security, which they had made at first. This was not accepted, and the thirty-seven tons have not been delivered, but are still retained as security for the freight money, and for this refusal to deliver, the libellants have brought this suit.

The first question to be disposed of, in this part of the case, is whether Captain Holt had the authority to make the contract, embraced in this bill of lading, for this is the one upon which the suit is founded. Some confusion crept into the argument of the case, by confounding this contract with the agreement made by Captain Holt with the libellants, during the winter, at Deep River. It was insisted by the quarry company, that the master could not, under the circumstances, bind the owners by a contract for the future employment of the vessel. That may be conceded. But he could, and did bind them, by receiving this coal on board, and signing this bill of lading. And, as already remarked, it is this contract, upon which the libel is founded, and the duty of the parties under it is to be determined by the settled rules of maritime law. The claims set up by the libellants, as to the mode of paying this freight, will be considered hereafter. For the present, therefore, I lay out of the case, the agreement made by the master with the libellants at Deep River, during the winter. The master, both by the rules of maritime law, and by the course of business, long pursued by him, with the knowledge of the quarry company, in regard to return freights, had full power to receive this coal on board, and sign the bill of lading. The vessel then became bound to the cargo, and the cargo to the vessel, for the faithful performance of the contract by both parties. This is familiar law.

The next question is, whether the owners of the schooner were justified in detaining part of the cargo until the freight was paid. This point is entirely free from doubt. They could have detained the whole, if they had so chosen, as the lien of the owners of the vessel attached to the whole as security for the freight money. No principle is better settled, both at common law, and by the maritime codes, than that which holds that the ship owner, and the master as his agent, have a lien on the goods carried in their ship, for the freight. Indeed, a late writer remarks that this has never been denied. Pars. Mar. Law, 1, 125. Of course they have

the right to retain the merchandise until this lien is discharged, for, unless there is some special agreement to the contrary, the lien is lost by the delivery of the goods. In the case of Drinkwater v. The Spartan [Case No. 4,085], Mr. Justice Ware remarks: "The general right of the master and owners to retain the merchandise for the freight due upon it, has not been denied. It is too well established to admit of doubt. It is a principle of the general maritime law, the common law of the commercial world, sanctioned by all the maritime codes, ancient and modern, and confirmed by numerous decisions of the highest courts, both in this country and England. Nor does there appear to be any difference in principle, nor is any recognized in law, whether the merchant takes the whole vessel by charter party, or sends his goods in a general ship. The lien of the owners is as perfect for the hire of the vessel stipulated in the charter party, as it is for the freight stipulated in the bill of lading." This doctrine is recognized by Mr. Justice Story, in the case of Certain Logs of Mahogany [Id. 2,559]. In the latter case, it is stated that, by the maritime law, the shipper has a right to have the goods unlivered, so that he can examine them to ascertain whether they are damaged or not. But this point does not, and could not arise in the present case. This cargo was all anthracite coal, which was not susceptible of damage. The existence of the lien of the master and owner on the cargo, for freight, is also recognized in Raymond v. Tyson, 17 How. [58 U. S.] 53. In that case, and many others, it is said that this lien may be waived without express words to that effect, if there are stipulations in the charter party, inconsistent with the exercise of the right of lien, or when it can be fairly inferred that the owner meant to trust to the personal responsibility of the charterer. See, also, The Eddy, 5 Wall. [72 U. S.] 481. I shall hereafter consider whether there is anything in this bill of lading, or in the agreement relied on by the libellants, inconsistent with the right of lien, which was binding on the owners of this schooner.

The authorities generally state that this right of detention continues "until the payment of, or security for, the freight." It is claimed by the libellants that they offered security, and, therefore, complied with the rule, and were, consequently, entitled to delivery. It becomes necessary, therefore, to determine whether they offered the security contemplated by law. I assume that they tendered such security as they proposed to give, and thus clear the case of all technical difficulties. What security did they tender? A statement of the prior dealings between the libellants and Captain Holt, with the admissions of the former, will, of itself, furnish an effectual answer to their principal claim in this case. It appears from the testimony of one of the libellants, together with a transcript from their books, which they put in evidence, that on the 6th of November, 1867, Captain Holt was indebted to them to the amount of $30.03. This I assume to be for supplies furnished him for use on board of the vessel, though the evidence is not very clear on this point, and the items are not given. Under the same date he is charged $14.76, which, from the items, and the statement of the libellants, appears to have been supplies and provisions for use on the vessel. November 27, 1867, the captain is charged with $25.15 for amount paid the mate on the captain's order. November 28th, $13.88 is charged, and the articles are stated by the libellants to have been for provisions for the schooner. December 19th, a small charge of $1.50 appears in the account, but whether the article was for the schooner does not appear. From December 23rd to December 30th, $31.92 is charged, and the libellant Lane testifies that this amount was for supplies furnished the captain's family. December 30th, $15.55, for goods delivered to the mate on the captain's order. From January 7th to January 29th, 1868, $29.54, supplies to the captain's family. January 30th, cash $50, paid the captain. February 6th to 26th, $27.07, for family supplies. March 28th, $60.64. This latter amount was for supplies furnished the mate's family, on the verbal order of Captain Holt, while the former was at Cold Spring, in charge of the schooner as shipkeeper. I may have omitted some small items, but this is substantially the account of the libellants as it stands on their books, and was explained by the testimony of the libellant Lane, with the exception of a small bill of items, amounting to $9.84, for implements and small furniture for the schooner. There is also a credit on the general account of $30.10. Now the agreement made between the master and the libellants, at Deep River, some time during the winter, and I infer, from the evidence, about the 30th of January, 1868, was that Holt should bring a load of coal for the libellants from Rondout to Deep River, as soon as navigation opened, provided he was not held to his Fall River engagement, and that the freight money should be applied on this account, and thus extinguish it as far as it went. When, therefore, the libellants offered security for the freight, it was, to use the language with which they accompanied the offer, "for the freight for which they were liable," or, as stated by the libellant Lane, "if they were legally liable." The latter testified on this point as follows: "I considered that we had performed our part of the contract—that we had paid for the freight. We agreed to give security to pay if we were legally liable." It is obvious that this was practically nothing more than an offer of security to pay the freight if the owners should be able to establish their claim to it at the end of a lawsuit. It was in no sense such a security to

pay the owners, or the master then in charge of the schooner, the freight earned by the carriage of this coal, as the law contemplates, and they were justified in refusing to accept it, and in declining to deliver the coal until the freight was paid or properly secured.

The assumption of the libellants that the owners of the schooner generally were liable to them for this debt of Holt, and that therefore they had a right to delivery of the cargo, without other payment, was clearly an error. In the first place, they charged the account on their books alone to Holt, and not to the schooner, or her owners generally. It is true that this is not a conclusive circumstance, but one that an adequate explanation might overcome. If the supplies were furnished on the credit of the master, instead of that of the vessel or her owners, then the former is alone liable. This would be true, whatever might have been the character of the supplies furnished. In the second place, no liability could attach to the owners generally for the supplies furnished Captain Holt for this vessel, under the circumstances. He was running her under a special contract to victual and man her himself, and this was known to the libellants. The libellant Lane, in his testimony, said: "I understand that coasting vessels, on Connecticut river, to and from other ports, are run on this plan. The captain victuals and mans the vessel, and takes a certain share of her earnings, after such deductions as are agreed upon. The share of the captain depends not upon custom, but upon special agreement." This was, in general terms, the arrangement of Holt with the owners. In victualing and manning the schooner, he was acting on his own account, and not as the agent of the general owners. To that extent he was owner pro hac vice, and could not bind the owner for supplies. Webb v. Pierce [Case No. 17,320]; Mayo v. Snow [Id. 9.356].

This doctrine has been recognized by the supreme court of the United States, although the latter tribunal has held that the owner pro hac vice can, in case of necessity, and when in a foreign port, hypothecate the vessel for repairs and supplies, although he cannot bind the owners personally. Thomas v. Osborn, 19 How. [60 U. S.] 22, 30. I do not overlook the fact that in Webb v. Pierce, already cited, the master had entire control of the vessel, and power to direct her movements and employment; and that this arrangement was deemed by the court a severance of the usual relation of principal and agent which ordinarily exists between master and owners. In such a case even persons who have no actual notice of the arrangement cannot contract with the master for supplies so as to bind the owners personally. In this case Holt had substantial control over the freighting business on his return voyages; but I do not rest this point

on that circumstance. It is sufficient that these libellants knew that he was running this vessel under an agreement with the general owners by which he and not they were to victual and man her. In that matter he was, within the libellants' knowledge, acting as principal, and not agent. It follows, of course, that these libellants could not charge the owners generally for these stores and provisions delivered to the master, or on his order, to the mate. As this could not be done directly, the liability could not be created indirectly by an arrangement with the master that the future earnings of the vessel should be applied to the payment of this debt against him. The master of a vessel has no power to pledge the freight for his private purposes. Keith v. Murdoch [Case No. 7,652]. The offer of the libellants, therefore, to give security for the freight on this coal "if they were legally liable" was a conditional offer, resting upon the baseless assumption that they had already paid the amount due, and were, therefore, not liable at all. No such offer as that could entitle them to delivery. If the words "as agreed" written in the bill of lading after the printed words "they paying the freight for the same," refer to this agreement to apply the freight on this debt of Holt, they cannot be allowed to alter the result, for the master had no authority to make such an agreement, and this the libellants must be presumed to have known. This disposes of the principal claim set up by the libellants; but there seem to be so many vague notions afloat in the vicinity of Connecticut river, touching the liability of domestic vessels and their owners for supplies contracted for by the master, that it may be well to say a word on that subject in connection with the facts developed in this case.

It will be noticed by the account of the libellants and their testimony, already referred to, that a considerable portion of the supplies furnished were not for the schooner at all. They were advanced to the master while he was off duty, at home, and his vessel lay in a foreign port disabled for the winter. They were supplies, not for the schooner Daniel Russell, but for the family of Captain Holt. To call such a transaction furnishing supplies to a vessel is little short of absurdity. As well might a builder charge the owners of a vessel for repairs on the master's house, or a physician for services in curing his children. Indeed, such advances, wherever the vessel might be, and however employed, and whether the master be merely master, or owner pro hac vice, have no relation to her—are not for her benefit, and are not chargeable to her owners, nor can the debt for them be made a lien on the ship. It is elementary law that the only supplies for which a ship or its owners are liable, when contracted for by the master, are those which relate to the ship itself or to her navigation and use in the business of the voyage.

They must be fit and proper for her, and pertain to her wants, necessities and business as an instrument of commerce. Parsons in his work on Maritime Law remarks, "One general limitation of the power of the master to bind the owner by the contracts he makes for him is this: they must relate to the condition, or the use and employment of the ship, and be within the usual duty and business of the master." Volume 1, p. 383. In Rocher v. Busher, 1 Starkie, 27, Lord Ellenborough remarked in regard to money advanced to the master: "The money supplied must not be understood of an indefinite supply of cash, which the master may dissipate, but only such as is warranted by the exigencies of the case, as for the payment of duties or other necessary purposes." Chief Justice Abbot, in his work on Shipping (page 175, Story & Perkins' Ed.), after citing Lord Ellenborough's remark, adds: "And it must be advanced expressly for the use of the ship, otherwise, although expended for that purpose, the owner will not be responsible for it to the lender."

The necessaries which a ship may need in the course of her voyage, of course include victualing for the crew, and such funds as the master might require for the payment of their wages then due. But the notion that while a vessel is laid up in a foreign port, a merchant residing in the state to which she belongs, can charge the owners for supplies furnished the master for the use of his family residing at the latter place, has no foundation in law or good sense. Indeed such supplies are not chargeable to the owners under any circumstances, in the absence of an agreement on their part to that effect.

The same principles are applicable to the advances made to the mate upon the order of the captain, while the former was in charge as shipkeeper at Cold Spring. It is possible that this mate at Cold Spring in charge of the schooner, might have obtained there, on the credit of the owners, such supplies and necessaries as were wanting to enable him to perform his duty and protect the vessel; and if he could not have obtained them on the credit of the owners, might have bound the vessel itself; though this point is not clear. The Harriet [Case No. 6,097]. But if he chose to rely on advances made at a home port, even for his wants there, he should have applied directly to the owners, and not to the master. But, as already remarked, supplies to his family at Deep River were in no sense supplies to this vessel at Cold Spring, and the owners are not responsible for them, although they were, as it is claimed by the libellants, advanced on the order of the master.

It necessarily follows that there is no liability on the owners of this vessel generally for the supplies and provisions furnished Captain Holt while he was master. So far as victualing and manning the vessel was concerned, he acted for himself, and not the owners. Even if he had been in a foreign port he could not have obtained supplies on the credit of the owners, though the necessities of the vessel might have required them. He could only have bound the vessel itself, by a tacit or direct hypothecation. This is the doctrine of Thomas v. Osborn, 19 How. [60 U. S.] 22, already cited. To the same point is Freeman v. The Buckingham, 18 How. [59 U. S.] 182. This rule would apply to the case under consideration, even had the articles purchased by Holt been for the vessel and consumed on board of her. As to those advanced to him for the use of his family when the vessel was laid up, under no circumstances could the owners have been made liable for them without their express consent. As to the $50 cash paid Holt January 30, that stands upon no better ground. To be sure the libellant Lane says that this sum was advanced to him as part of the freight money on this coal, which he was to bring at the opening of navigation. But there is no evidence that it was intended to be employed, or was in fact employed, in promoting the voyage. The master was at home. The vessel was frozen in and laid up at a foreign port. The fair inference is that the captain wanted this money for his own private purposes. For that we have seen that he could not pledge even a present freight of his vessel. A fortiori he could not pledge her future earnings.

As already remarked, the account of the libellants shows a small bill of $9.84 furnished the schooner on the order of Captain Holt, for small articles, of a character pertaining to what may be called her furniture. They were not provisions for her crew, but implements for necessary and permanent use on board. They were furnished during the summer of 1867, while the vessel was pursuing her voyages. They were articles required for immediate use, and though furnished at a home port, it was at a place twenty miles distant from the residence of the principal owner. Such articles, immediately needed for current use, I think the master could, in the absence of funds in his hands, obtain, even in a home port, at this distance from the owner's residence, upon the credit of the owner. In Jordan v. Young, 37 Me. 276, 280, the court say: "The master of a vessel can do all things necessary for the prosecution of the voyage. But this authority does not usually extend to cases where the owner can interfere, as in a home port. If the vessel be at a home port, but at a distance from the owner's residence, and provisions or other things require to be provided promptly, then the occasion authorizes the master to pledge the credit of the owner." But it must not be inferred from this that the authority of the master to bind his vessel, or pledge the credit of her owners, for supplies and repairs is without limit. It was remarked by Dr. Lushington, in the case of The Druid, 1 W. Rob. Adm. 391, 399,

that "in all causes of action, which may arise from circumstances occurring during the ownership of persons whose ship is proceeded against, I apprehend that no suit could ever be maintained against the ship, where the owners were not themselves liable, or where their personal liability had not been given up, as in bottomry bonds, by taking a lien on the vessel. The liability of the ship, and the responsibility of the owners, in such cases, are convertible terms; the ship is not liable if the owners are not responsible, and, vice versa, no responsibility can attach upon the owners, if the ship is exempt, and not liable to be proceeded against." Now, it is quite true that this doctrine is not of universal application in this country. We have already seen that in cases where the master, pro hac vice, contracts for supplies, even in a foreign port, he may bind the ship, but cannot pledge the personal credit of the owners. But ordinarily, where the master simply represents the general owners, I apprehend that the doctrine laid down by Dr. Lushington is the true one. As an eminent admiralty judge, his decisions command the highest respect. In view of this doctrine, it will be instructive to look at the state of the law in this country as to the extent of the master's power to create a lien on his ship for repairs and supplies. This is well stated in 3 Kent, Comm. 169, 170: "In this country, it was formerly, and rather loosely, declared in some of the admiralty courts of the United States, that the person who repaired or furnished supplies for a ship, had a lien on the ship for his demands. But the doctrine was examined, and the rule declared with great precision, by the supreme court of the United States, in the case of The General Smith, 4 Wheat. [17 U. S.] 438, and reasserted in the case of The St. Jago de Cuba, 9 Wheat. [22 U. S.] 409. The rule of the English common law is explicitly adopted, that material men and mechanics, furnishing repairs to a domestic ship, have no particular lien upon the ship itself, or its proceeds in court under a decree of sale, for the recovery of their demands, with the exception of the shipwright who has possession of the ship. As long as he retains possession, he has a lien for repairs. The distinction is, that if repairs have been made or necessaries furnished to a foreign ship, or to a ship in the port of a state to which she does not belong, the general maritime law, following the civil law, gives the party a lien on the ship itself for its security, and he may maintain a suit in rem, in the admiralty, to enforce his right. But in respect to repairs and necessaries in the port or state to which the ship belongs, the case is governed by the municipal law of that state, and no lien is implied unless it is recognized by that law." By the municipal law of this state, no such lien is created or recognized. Buddington v. Stewart, 14 Conn. 404. Under this doctrine of the supreme court of the United States, it is clear that the master can create no lien on the ship for repairs and supplies in a port of the state to which she belongs, and where her owners reside. The question arises, can he bind the owners personally by such a contract? The authorities on this point, though somewhat numerous, are not very uniform or consistent. But they undoubtedly imply exceptions to the rule laid down by Dr. Lushington, and their general tendency is to support the doctrine that the owners are personally responsible for such repairs and supplies, ordered by the master, "as are reasonably fit and proper, and apparently necessary to enable the vessel to navigate the sea, and perform her voyage in safety," though obtained in a home port, and especially in one at some distance from that at which the owners reside. Jordan v. Young, 37 Me. 276; 1 Conk. Adm. (2d Ed.) 74, 75. The question of the liability of the owners for repairs and supplies furnished on the order of the master at the port of their residence would not often arise, for such acts of the master would usually be known to the owners, and his authority to make the contracts presumed.

Another point raised by the pleadings in this case, and discussed on the argument, was whether Holt, at the time of his dealings with the libellants, was a part-owner of the schooner. This question is not important, in the determination of the case, for his power as master was not enlarged by his being part owner, so far as these transactions are concerned, unless with reference to the payment of the shipkeeper while the vessel was laid up at Cold Spring. He left the mate in charge, at small wages, and informed the agent of the other owners of the fact. The payment of his wages at any particular time or place was not a matter of necessity. Supplying his family, at Deep River, was not a duty of the owners. It was indeed, their duty to pay him his wages, but there was no necessity for Captain Holt to pledge their credit for that purpose, and, under the circumstances, he had no authority to do so. The principal owners lived near Deep River, were abundantly responsible, and an application to them could have been made with promptness and ease. The service of the shipkeeper did not relate to the navigation of the vessel, nor did the supplies furnished relate to her care and supply, and there is no principle known to the law which can bind the owners to pay this debt contracted by Holt. The latter, certainly, could not as part-owner, in a home port, pledge the future earnings of the vessel to a third party making the advances. Whether one part-owner can bind another at all, in a home port, for repairs and supplies to the vessel itself, without specific authority, is still an open question. 1 Pars. Mar. Law, 90.

But, to prevent misapprehension hereafter, it must not be inferred that this court assents to the claim set up by the quarry company,

that Holt is not to be deemed a part-owner, because he had mortgaged his share in the vessel. They set up in their answer, and proved, a mortgage to them by Holt of his interest, to secure the payment of five hundred dollars, or so much thereof as might be found due on final settlement, and also to secure any earnings of the vessel that might thereafter become due from Holt to them. This mortgage was dated September 5th, 1866; but no possession was taken by the mortgagee under this mortgage. The relation of the mortgagor and mortgagee, to all the rest of the world, remained the same. Holt still continued in possession as part-owner and master. Under these circumstances, he is to be deemed a part-owner, as to third parties contracting with the vessel in regard to freight or supplies, just the same as if no mortgage had been given. The mortgagee of a vessel, out of possession, is never in this country, regarded as the owner. If he were, very serious consequences would follow. He would then become personally liable for supplies and repairs. "But it is well settled in our law, that a mortgagee out of possession is not liable for supplies and repairs. And it is equally well settled, that the holding of a conditional bill of sale, or having the mere legal title to a vessel, does not, of itself, render a party liable. The law presumes the credit to be given to the party in possession as acting owner, and as long as he remains in possession, with the consent of the holder of the legal title, and manages and controls the vessel, and receives the profits, he is, for all practical purposes, the owner. So far as he is concerned, the law treats the mortgage as if it had no existence." Fland. Shipp. §§ 400, 401. In this case, the quarry company merely held the legal title as security for the obligations of Holt to them. The practical ownership, as to third parties in their dealings with the vessel, remained the same as if no mortgage had been given. 1 Pars. Mar. Law, 116.

I come now to the question as to what decree is proper to be rendered in this case. I have already disposed of the question of the lien of the owners on this coal for the freight money, and their consequent right to detain it until the same was paid or secured. This lien attached to the whole cargo, and the master might have landed it at the port of delivery, and placed it in charge of a third person, and, if the freight money continued to be withheld, the owners of the vessel could have kept it in that condition, or libelled it, had it sold by a decree of the court, and thus obtained the freight money. They, however, chose to deliver a part and detain the rest. The lien on the part delivered was, of course, extinguished by delivery. After some doubt, I am inclined to the opinion that the lien for the whole freight may be considered as remaining on that portion of the cargo detained. It was broken coal, in bulk, belonging to one owner and consignee. That a part was detained, instead of the whole, was no injury, but a benefit to the shipper and consignee. Abb. Shipp. (Story & Perkins' Ed.) p. 461, note 2. The remaining portion, which was not delivered, was never landed at Deep River at all, but was taken away by the schooner, and left at Portland, and notice given to the libellants that it was at their disposal whenever the freight should be paid. The proper course would have been to land this remainder at the port of delivery, and place it in charge of a third person, subject to the libellants' order, on their paying freight. But this point was not made a question on the trial. The whole struggle was over the liability of the owners to deliver, without further or other payment of freight than the advances made to Holt.

As the owners of the vessel undertook to sever the cargo, and retain only so much as would secure the freight money due, and took this quantity away, they should have seen to it that they took no more than was necessary. They detained and removed thirty-seven tons, worth, as I find from the evidence, three hundred and seventy dollars. The freight on the whole amounted to two hundred and forty-six dollars. As they show no necessity for thus taking the amount not delivered away from the port of the consignee, they substantially converted it to their own use, and must be held liable for any excess of its value over the amount of the freight. This excess was one hundred and twenty-four dollars. To this 1 will add the $9 84, for which they are indebted to the libellants for supplies furnished the vessel directly— the whole, with interest from April 20th, 1868, to the present time, amounting to $152 00. Let a decree be entered for the libellants for that amount, with costs, against both the respondents. Holt is liable for the balance of the libellants' account. Though much of the account against him would not have been recoverable in a suit in admiralty, brought directly upon it, as it did not rest on a maritime contract, yet he bound himself, as master, to deliver this coal at the stipulated freight of two dollars per ton, in discharge of the debt due from him to the libellants. He received the cargo, and then became bound to the performance of his contract, which he failed to complete. He is therefore personally liable for his failure. Let a decree be entered against him separately for $279 50.