## MAURY & Co. *v.* CULLIFORD & CLARK.[*]

*(Circuit Court, E. D. Louisiana.   December 23, 1881.)*

1. ADMIRALTY JURISDICTION—CHARTER-PARTY—MARITIME LIEN.

    A maritime lien is not essential to give the courts of the United States admiralty jurisdiction. In the charter-party in this case there is a complete contract for maritime services to be rendered ; it is a maritime contract, and the United States courts have jurisdiction over an action for damages for its breach.

2. CHARTER-PARTY—CANCELLATION OF CONTRACT.

    The notification by the libellants to the defendants that they would hold them in damages for non-compliance, and the refusal of the libellants to give orders after the time for fulfilling the contract had expired, are not good grounds for construing the charter-party to be cancelled.

The facts are set forth in the opinion of the court.

*Thomas J. Semmes,* for libellants.

*John A. Campbell,* for defendants.

PARDEE, C. J.   The record shows the following facts:

(1) That June 12, 1879, the parties entered into a contract of charter in the terms following, to-wit:

"It is this day mutually agreed between Messrs. Culliford & Clark, owners of the good screw steam-ship called the Romulus, or boat of similar size, of 1,442 tons gross register, and 922 tons net register, say from 4,000 to 4,500 bales cotton, now whereof ———— ———— is master, of the one part, and Messrs. J. H. Maury & Co., of Mobile, merchants and charterers, of the other part, that the said ship being tight, staunch, and strong, and every way fitted for the voyage, shall, with all convenient speed, having liberty to take outward cargo for owners' benefit, but not West India or infected ports, proceed to the South-west pass or Key West, at captain's option, for orders, to be given immediately upon arrival, to load at Pensacola or Mobile, one port only, or so

*Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

near thereunto as she may safely get, and there load from the said charterers or their agents a full and complete cargo of cotton, in square bales, to be compressed in Taylor or equally good presses, at ship's expense, as customary, not exceeding what she can reasonably stow and carry over and above her cabin, tackle, apparel, provisions, furniture, engine-room, machinery, and coals, and being so loaded shall therewith proceed to Liverpool, or to a safe port on the continent between Havre and Hamburg, Holland and Dunkirk excepted, both inclusive, or to Revel, one port, as ordered in signing bills of lading, or so near thereunto as she may safely get, and deliver the same agreeably to bills of lading, and so end the voyage. (Restraint of princes and rulers, the dangers of the seas, rivers, and navigation, fire, pirates, enemies, and accidents to machinery or boilers during the said voyage, always excepted.)

"Eighteen working days are to be allowed the said charterer (if the ship is not sooner dispatched) for loading; to count from the time the steamer is ready to receive cargo and written notice thereof by the master to the charterers or their agents; to be discharged as fast as the custom of port will permit. The cargo to be loaded and discharged according to the custom of the respective ports. Charterers to have option of ordering the steamer from port of call to an Atlantic port to load under this charter-party; all conditions remaining the same as within. In the event of the steamer being ordered to load at Mobile, charterers to pay half the lighterage incurred. Should the steamer be ordered to Havre, Mr. F. Dennis, or charterers' assignees, to transact the ship's inward business for $\frac{1}{2}$ per cent.

"And the said charterers do hereby agree to load the said vessel with said cargo at her port of loading, and also to receive same at her port of delivery, as herein stated, and also shall and will pay freight as follows: At the rate of, if discharged at Liverpool, seven-sixteenths per pound gross weight, delivered; if discharged at any other safe port on the continent, seven-sixteenths per pound gross weight, shipped; if discharged at Revel, one-half pence per pound gross weight, shipped; for cotton in square compressed bales, with 5 per cent. primage thereon. Payment whereof to become due and be made as follows: Cash for ordinary disbursements at port of loading, if required, not exceeding £——, to be advanced to the master by the charterers' agents, at the current rate of exchange, against the captain's draft, at issuance, on the consignee or agents, together with insurance, and a commission at $2\frac{1}{2}$ per cent., and the remainder, on the true delivery of the cargo, in cash without discount. Lay days not to commence before the fifth of October, and merchants to have the option of cancelling this charter-party should steamer not arrive at Southwest pass or Key West by the twentieth of October. And also shall and will pay demurrage the sum of 40 pounds British sterling per day, to be paid day by day for each and every day the steam-ship be detained over and above the said laying days and times as herein stated, but the vessel not to be required to remain on demurrage longer than 10 days. The steam-ship to be consigned to the charterers, or their agents, at the port of loading, paying $2\frac{1}{2}$ per cent. commission. The master to sign bills of lading at current rates of freight, if required, without prejudice to this charter-party; but should the aggregate freight by bills of lading amount to less than the total chartered freight, the master to be paid the difference in cash before sailing.

"And for the true performance hereof each of the said parties doth hereby bind himself and themselves unto the other in the penal sum of estimated freight, —— pounds of good and lawful money of Great Britain; it being agreed that for the payment of all freight, dead freight, and demurrage the said master or owners shall have an absolute lien and charge on the said cargo.

"Five per cent. commission is due on the execution of this charter-party to

Stoddard Bros., Liverpool, by whom the steam-ship is to be reported at the custom-house on her arrival at Liverpool, or by their agent at any other port of discharge."

(2) That the said chartered ship Romulus did not *proceed with all convenient speed* with liberty to take outward cargo, etc., to the South-west pass, or Key West, at captain's option, for orders from said Maury & Co., but did proceed to New York, and from New York to Rouen, France, and from Rouen to Penarth, Wales, and from thence, October 29, 1879, to South-west pass, arriving there November 18, 1879, and then reporting to libellant for orders.

(3) That the defendants made from time to time various propositions to the libellant to furnish him a ship under the charter-party, as follows:

September 1, 1879, an offer was made to send the Romulus, then in New York, to arrive in September. This was declined as too soon. The same day an offer was made of the Deronda, then in Liverpool, to arrive in September. It does not appear whether the Deronda answered the charter or not. This offer was also declined, as the arrival would be too soon for libellant's engagements.

September 18, 1879, an offer was made of the Douro, to arrive at the end of October, which was declined as not complying with charter.

(4) That the defendants, Culliford & Clark, except as above set forth, made default and did not furnish the ship Romulus, or a boat of similar size, to the said Maury & Co., as by the aforesaid contract they had bound themselves to do.

(5) That by the failure of said Culliford & Clark to comply with the terms of their said contract the said Maury & Co. were compelled to pay, and did pay, higher rates of freight on the cargo contracted to be shipped on said Romulus, or boat of similar size, to-wit, on 4,500 bales of cotton, and suffered other damages as set forth on the libel filed in this case.

The first objection argued to the court is that the said charter-party is a mere preliminary or preparatory contract, having reference to services of a maritime nature to be rendered; and the case of *The Tribune,* 3 Sumn. 144 is quoted. An examination of this case shows that while Judge Story admitted the proposition that the admiralty has no jurisdiction over preliminary contracts leading to maritime contracts, he held that the jurisdiction of the admiralty does not depend upon the name of the instrument, whether it imports to be a maritime contract. He further held that an agreement for a charter-party to be made at a later period might amount to a present charter-party, notwithstanding a more formal instrument was contemplated.

In the charter-party recited in this case there is a complete contract for maritime services to be rendered; and no other instrument was contemplated at a later period, nor of a more formal character.

The next objection is that the court is without jurisdiction upon a contract of affreightment until there is a ship, a voyage, and an engagement for services, and cargo offered and accepted; and that an admiralty court has no cognizance of damages for breaches of unexecuted charter-parties. That where there is no freight offered and accepted there is no lien, is well settled. See leading case, *Vandewater* v. *Mills*, 19 How. 82.

The real question to be determined is, is a maritime lien essential to give the courts of the United States admiralty jurisdiction?

In *Ex parte Easton*, 95 U. S. 72, Mr. Justice Clifford quotes from 2 Story, Const. § 1666, approvingly, as follows:

"Admiralty jurisdiction embraces all contracts, claims, and services which are purely maritime, and which respect rights and duties appertaining to commerce and navigation."

And then Justice Clifford says:

"Maritime jurisdiction of the admiralty courts in cases of contracts depends chiefly upon the nature of the service or engagement, and is limited to such subjects as are purely maritime, and have respect to commerce and navigation."

In this case it was held that there was a maritime lien for wharfage. The syllabus in *Ins. Co.* v. *Dunham*, 11 Wall. 1, giving the point of the decision, is:

"As to contracts, the true criterion whether they are within the admiralty and maritime jurisdiction is their nature and subject-matter, as whether they are maritime contracts having reference to maritime service, maritime transactions, or maritime casualties, without regard to the place where they were made."

And Justice Bradley, organ of the court, in the same case, says, after reviewing all the authorities:

"It thus appears that in each case the decision of the court, and the reasoning on which it was founded, have been based upon the fundamental inquiry whether the contract was or was not a maritime contract. If it was, the jurisdiction was asserted; if it was not, the jurisdiction was denied. And whether maritime or not maritime depended not on the place where the contract was made, but on the subject-matter of the contract. If that was maritime, the contract was maritime. This may be regarded as the established doctrine of the court."

In this case it was decided that a contract of marine insurance was a maritime contract, and there was no contention for a maritime lien.

A number of cases from the various circuit courts of the country,

bearing on this question, have been cited, and a large number can be found, which cases leave the question open—still unsettled. English authorities cited do not bear on the case, because of the different jurisdiction of English admiralty courts, particularly since the admiralty act of 24 Vict. c. 10. See Parsons, Shipp. 842.

It is easily seen that there is no good reason for drawing the distinction sought to be made. The contract, which is the basis of this action, is indisputably a maritime contract. It relates wholly to ships, cargoes, freights, etc., on navigable waters. If it had been half complied with, not an objection could have been suggested as to our jurisdiction. If the defendants had broken their contract to the extent of one bale of cotton only, we could have amerced them. Are they to escape scot-free by the magnitude of their breach?

In the case of *Watts* v. *Camors,* lately decided in this court, the owners, for a total breach of a charter-party, filed a libel *in personam* against the charterers, and although the court held the charterers liable, no suggestion of want of jurisdiction was made; and I understand these libels have generally been allowed in this circuit.

The third objection argued is that the contract was executed in Great Britain and is to be construed according to the law of the place of contract, and that under the laws of Great Britain it was not a maritime contract, and the court of admiralty would not have jurisdiction either *in rem* or *in personam;* and cited *The Daunebrog,* 4 Ad. & Ecc. 386.

The restricted jurisdiction of the English admiralty courts has been frequently noticed by our courts, and see act, 24 Vict., called the "Admiralty Court Act."

Justice Bradley says, in 11 Wall., quoted above, that the place where a maritime contract is made does not affect its character, and that our admiralty jurisdiction depends on the nature and effect of the contract.

The other objections are based on the proposition that Maury & Co. had cancelled the contract by their notification to the defendants that they would hold them in damages for non-compliance, and by their refusal to give orders to the Romulus after the time for fulfilling the contract had expired. It can hardly be claimed that the persistent demands of Maury for the execution of the contract or damages for non-execution should be construed as a cancellation of the same, and yet that is all this proposition seems to amount to.

The whole fact is that defendants contracted to furnish the libellant a ship of certain character between the fifth and twentieth of

October, 1879. They did not do it, and have no excuse therefor but inconvenience to themselves, and the refusal of libellant to take an earlier or later ship, or a ship not complying with the contract. And in the record is an attempt to prove a custom in England that the clause in the charter-party giving libellant authority to cancel the contract in case no ship arrived by the twentieth of October, really means that libellant waived all damages if the ship did not arrive according to the charter, reserving to himself, if the ship ever did arrive, the privilege of accepting her or not. In other words, the owners had the option of sending the ship or not. If sent in time, the charterer must accept her; if not in time, the charterer might use his option to accept or reject her. And this, the witnesses swear, is necessary to secure mutuality of contract. But the learned proctor for respondents has not argued this defence, either orally or in his brief, and I doubt if he relies on it. In *McAndrew* v. *Adams,* 27 Eng. C. L. 297, under similar clauses in a charter party, no such custom was urged or considered.

I finally conclude that under all the circumstances of this case, and the authorities presented, I will maintain jurisdiction, and hold the defendants for all damages claimed in the libel and resulting from the failure of defendants to execute their contract. A reference and further proof will be necessary to ascertain such damages. It follows that the cross-libel filed by the defendants for damages growing out of the attachment issued in this case must fall. A decree in accordance herewith will be entered by the clerk, and on the final decree the facts and the conclusions of law will be found as set forth herein.