## McKay *et al. v.* Ennis *et al.*[1]

### (*District Court, S. D. New York.* December 21, 1888.)

**1.** SHIPPING—BILLS OF LADING—MISCONDUCT OF MASTER.

A master who is in doubt as to the weight of cargo received, and who consequently inserts in the bill of lading, "Vessel not responsible for difference in weight," is not chargeable with misconduct in signing such bill of lading, though it eventually appear that it calls for more cargo than was actually received on board.

**2.** SAME—CHARTER-PARTY—WEIGHT OF CARGO—LIABILITY OF VESSEL—SET-OFF.

A chartered vessel received on board less cargo than was called for by the bill of lading, through fraud or error of the consignor, but the master, before signing, inserted in the bill of lading, "Vessel not responsible for difference in weight," and she thereafter duly delivered her cargo, but, owing to the error in the bill of lading, the draft drawn against it being protested, and the transmission of the bill of lading being delayed, no consignee appeared to receive the cargo on arrival, and it was consequently taken by the collector and afterwards sold for customs duties. *Held,* that the ship had made a "right delivery" of her cargo, and that the charterers, who were also the consignees of the cargo, were liable for the agreed hire of the ship, notwithstanding that they had suffered an indirect loss through the error of the bill of lading, by not having funds sufficient to meet the draft drawn against the quantity specified in it; such damage being too remote to be off-set.

In Admiralty. Action for charter money against charterers of the bark Platina.

*R. D. Benedict,* for libelants.

*Whitehead, Parker & Dexter* and *Mr. Parker,* for respondents.

BROWN, J. On the 6th of February, 1888, the libelants, owners of the barks Platina and Silicon, entered into two separate contracts, by which they chartered those vessels to the respondents to proceed to load with ore at Santander, Spain, and to deliver the same at Philadelphia. The Platina loaded at Santander as agreed, and, having received her cargo from Casuso y Hijo, a bill of lading therefor to his order was delivered to him by the master.

On arrival at Philadelphia, about May 1st, no person appearing with the necessary bill of lading or other documents authorizing them to receive delivery of the cargo within the time limited by law for unloading, (Rev. St. § 2880,) it was directed by the collector to be discharged and

[1]Reported by Edward G. Benedict, Esq., of the New York bar.

stored in the public store; and afterwards, to avoid further expense, it was sold for duties and charges, netting a balance insufficient to pay the freight due under the charter.   The libelants had given notice to the collector, pursuant to law, of their lien on the cargo for freight; and on the trial of this action they offered to assign the claim and the lien to the defendants on payment of the amount due under the charter.   The defendants had a contract with Casuso whereby the latter agreed to sell them iron ore to be shipped on various vessels as sent to Santander therefor by the defendants; the ore to be "delivered into the ship's hold, free of scale," "the weights to be according to United States custom-house certificates; terms of payment by draft at 60 days' sight on London bank credit for amount of invoices, plus advances to the master, acceptable against delivery of bill of lading and consular invoices."

The Platina and the Silicon were chartered by the defendants and sent out for the receipt of ore under the foregoing contract.   The Silicon being loaded first, Casuso presented for signature a bill of lading stating the receipt of 945 tons.   The master, believing that the vessel carried only 825 tons, at first refused to sign the bill of lading; but he finally yielded to the importunity of Casuso, and signed the bill of lading, after first adding, "Vessel not to be responsible for difference in weight;" but before sailing he entered a protest with the consul against the bill of lading, made out for an excessive amount, as he believed.   Afterwards the master of the Platina was in like manner induced by Casuso to sign a bill of lading for 1,015 tons, the same clause being first inserted in the body of the bill of lading.   On the subsequent delivery of the cargoes it was found that by the United States custom-house certificates the weight of the Silicon's cargo was but 788 tons, and that of the Platina but 949 tons.

Upon receipt of the bills of lading severally, Casuso at once drew drafts on London, pursuant to his contract, for the full number of tons stated in the respective bills of lading and invoices; and the draft on account of the Silicon's cargo, being presented first, was paid.   The defendants were informed by the libelants at the outset that the two barks could not carry over 1,800 tons; they had consequently provided credit in London for that amount only; and when the second draft was presented, based upon the Platina's bill of lading of 1,015 tons, the gross amount of the two bills of lading and invoices—1,994 tons—being considerably in excess of the credit provided, payment of the second draft was refused. Delay ensued in the transmission of the bill of lading thus thrown back upon Casuso, who sent it to Brown Bros., of Philadelphia, for his account. But it was not received by them until after the collector had taken possession of the cargo, and had begun to store it.   An attachment had also in the mean time been issued against the cargo upon a debt of Casuso to one Romaine, and the defendants had also attempted to libel the cargo. But neither Brown Bros. nor the defendants, who had notice of all the proceedings, wished to interfere with the collector's possession, or to enter the goods, and pay the freight and charges.

Upon these facts the defendants contend that the masters of both vessels are chargeable with misconduct in signing the bills of lading pre-

sented by Casuso, and that the loss occasioned thereby is a defense to this action. The defendants, it is true, have paid Casuso nothing for the Platina's cargo, and have never received the bill of lading; but they have received no benefit from the Platina's voyage under the charter, and have also sustained a loss from the short delivery of the Silicon.

Several of the questions which have been raised, growing out of this transaction, are not necessary to be considered, the action being founded upon the charter, for the recovery of the charter moneys, namely "8s. per ton of 2,240 pounds delivered." The only questions are: *First,* whether the vessels made a "right delivery" of their cargo; and, *second,* whether the respondents' losses, under the circumstances stated, constitute any legal or equitable ground for recoupment.

1. There is no doubt that the stipulated hire of the Platina was earned. The Silicon's cargo was received by the respondents in the ordinary course. The Platina's cargo was not received by the respondents; but that was only because the respondents did not obtain from Casuso, the shipper, the necessary invoice and bill of lading to enable them, under the customs laws, to enter and receive the goods within the time allowed by law after the ship's arrival and readiness to deliver them. There is no suggestion that the action of the collector in Philadelphia was not strictly legal, through the failure of any person to appear and enter the goods. The ship's discharge of the cargo under the direction of the collector was therefore "a right delivery" of the cargo, and a fulfillment of the ship's contract under the charter. That completed her right to the stipulated charter money or hire, namely, eight shillings per ton, upon the amount delivered. The respondents became, under the charter, liable personally for the freight earned; and the cargo, lawfully delivered to the collector, was also subject to a lien for the freight, and remained in his hands for the benefit of whoever might prove to be entitled to it. Had there been no customs regulations applicable, the master might lawfully have stored the cargo on notice to the respondents, and the freight or charter money would have been similarly earned. *Fox* v. *Holt,* 4 Ben. 278, 299–302.

2. I do not think any legal or equitable ground of recoupment is established. It is assumed by the respondents that Casuso's conduct was fraudulent. There is doubtless strong suspicion of fraud on his part. But it is not the necessary inference, even from the testimony of the master, which is the only evidence in the case bearing upon that point. He says: "The ore was loaded from lighters. They had no facilities down there for weighing it, anyhow,"—and that he was not exactly certain about the weight; that Casuso told how much each lighter carried, and he figured it up, making it 1,005 tons. The bill of lading presented being for 1,015 tons, he objected to signing it, but finally did so, after inserting the clause, "Vessel not responsible for difference of weight." I do not think there was any breach of legal or equitable obligation by the master in signing the bill of lading in that form, under such circumstances. The bill of lading, with such a clause, is notice to whoever takes it that the amount and weight specified in the bill of lading are not guarantied. It is substantially equivalent to the other phrase,

"weight unknown," upon which it is well settled that the indorsee for value takes it subject to all risks as to the actual weight of the cargo. See *The Querini Stamphalia*, 19 Fed. Rep. 123, and cases there cited; *Jessel* v. *Bath*, L. R. 2 Exch. 267. Where there is dispute about the weight between the shipper and the master, I see no other course that is reasonably practicable than to sign the bill of lading with some such qualifying clause, except in a very gross case. It would be absurd to require the ship to incur the expense of unloading the cargo for the mere purpose of reweighing it, even if the means of reweighing were at hand. The master would not be permitted to sail without signing any bill of lading; and the result would be a dead-lock until one or the other yielded.

In the present case, moreover, there was an incongruity likely to lead to difficulty in the very terms of the contract of sale between Casuso and the respondents. That contract says: "Weights to be according to the U. S. custom-house certificates," which of course could only be obtained upon weighing at the end of the voyage; while the payments were to be "by draft on London, for amount of invoice, acceptable against delivery of the bills of lading and consular invoice;" that is, invoices and drafts were to be based on approximate estimates before the final determination of weights at the close of the voyage.

Considering that there were no facilities for weighing at the point of shipment, the necessary inference is that the respondents by their contract with Casuso were willing to trust him to make out a proper estimate of weight for the invoice and bill of lading, with authority to draw accordingly on London, leaving the final adjustment of balances to be made up after the weigher's certificates were obtained on delivery at Philadelphia. The respondents, therefore, took the risk of Casuso's accuracy, as well as of his honesty, in making out his invoices and bills of lading. Had the respondents not limited their credit in London, the second draft would have been paid like the first; and the claim against Casuso for excessive weight on the Platina's cargo would have been but a little over $100, without any of the large consequential loss which finally arose through the storage and sale by the collector from the want of a timely receipt of the invoice and bill of lading at Philadelphia. It does not appear that the respondents, on arrival, endeavored to enter the goods on a bond for forthcoming documents, as they might have done. Nor does any sufficient reason appear why, as soon as Brown Bros. received the bill of lading, the respondents should not have taken up the draft and bill of lading, and have then entered the goods in order to avoid a much greater loss; looking to Casuso for the difference on final adjustment.

The attachment suit of Romaine against Casuso was no obstacle, since the goods became the property of the respondents under the contract from the time of their delivery on board the vessel.

However this may be, no fault in the vessel is proved, and in no event could the master or the respondents be held for these large consequential damages. There is no evidence that the master had any knowledge of the terms of the contract between Casuso and the respondents, or of the

limited credits provided by the respondents in London to meet Casuso's drafts; and these were the accidental causes of the delay in the receipt of the bill of lading that caused the loss. Had the master signed the bill of lading as presented, even without qualification, no claim to these large consequential damages that accrued in Philadelphia could, I think, have been maintained; because they were not the natural consequences of the master's act. The claim would have been limited to the value of the shortage in weight; and any such liability for shortage is precisely what both vessels stipulated against upon the face of the bills of lading. This was notice to every one, the respondents' agents in London as well as others, of the liability to such shortage; and it was all the notice that the master was called on to give, under the circumstances of this case.

The libelants are entitled to a decree for the stipulated freight as the charter money earned by the ship's right delivery of cargo, with interest and costs; the decree to provide for an assignment by the libelants of their claim and lien for freight upon the proceeds of sale by the collector, on defendant's payment of the amount of the decree.