## Case No. 4,301.

### The EDWIN v. NAUMKEAG STEAM COTTON CO.

[1 Cliff. 322;[1] 23 Law Rep. 277.]

Circuit Court, D. Massachusetts. Oct. Term, 1859.[2]

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]
[2] [Affirming Case No. 4,300. Decree of the circuit court affirmed in 24 How. (65 U. S.) 386.]

F. C. Loring, for claimant and appellant.
Milton Andros, for libellants.

CLIFFORD, Circuit Justice. It is insisted by the libellant that the liability of the vessel is commensurate with that of the owners, and that the extent of it in regard to both must be ascertained and measured by the terms of the contract made by the master. On the part of the respondent, it is insisted, that the ship is not bound to the merchandise, or the merchandise to the ship, until it is actually placed on board, and that the liability, both of the ship and the owners, notwithstanding the terms of the contract, must be narrowed to the service actually performed by the vessel. It must be admitted that the question is not free of difficulty, and perhaps is involved in some doubt. Much must depend in its solution upon the view taken of the authority of the master, and the real nature and character of the service performed. Something also will depend upon the circumstances attending the making of the contract, and the situation and acts of the parties at the time it was made, and when the loss occurred, as furnishing the key to unlock and unfold its real intent and meaning. Seafaring men are known to be well acquainted with the port of Mobile, and the usual and ordinary course of business in lading vessels in that harbor. Small vessels go up to the wharves to take in cargo; but large vessels cannot approach the wharves at all, on account of the shoalness of the water over the bar, but anchor below and have their cargoes brought down in lighters. Vessels of an intermediate size generally go up to the wharves, and take in what cargo they can safely carry over the bar, and return to the anchorage below, either by their own means of sailing or by means of tugs employed for that purpose, and have the residue of their cargoes brought down, as in the case of large vessels. Large quantities of cotton are annually exported from that port, and the masters and owners of vessels engaged in the trade are as well acquainted with the navigation and the course of business as at the larger commercial ports. Owners send freighting vessels to that port in ballast or otherwise, seeking employment for their vessels, and trust very largely to the discretion of the master to stipulate upon the terms and conditions for transporting the cotton to other domestic ports, or to the foreign market. Northern vessels are largely engaged in that trade, and find their employment to a considerable extent from the agents of the manufacturer of the raw material, or from the northern merchant who has become the purchaser of the same, for the supply of the manufacturing establishments in the northeastern states. Shipments are made through agents or brokers residing in the port of lading, who contract with the master of the vessel for the transportation of the cotton, and deliver the same to him in pursuance of the contract of shipment. When the contract is for the transportation of cotton in vessels requiring the cargo to be lightered, in whole or in part, the master employs the lighter in behalf of the vessel, and pays for such partial conveyance on account of the owners. Transportation coastwise to the northern ports may be safely made in vessels of either of the classes before mentioned, so that the shipper or his agent has no motive or interest to inquire whether the cargo is to be lightered or taken on board at the wharves. He contracts as in this case that the cotton shall be transported for a given freight from the

wharf or the cotton-press, as the case may be, to the place of destination. Different vessels of the same tonnage require a greater or less depth of water, according to their construction, and accordingly vessels of an intermediate size may or may not require the assistance of lighters, as they are well or ill constructed for that peculiar navigation. Whether they can or can not go up to the wharves and take in their whole cargo is well known to the master of the vessel, but may not be known to the shipper or his agent. Shippers are governed, in making such contracts, by the price to be paid for the transportation, and are only indirectly interested in the cost of lighterage, so far as it affects the price of freight. On the other hand, the master, as the agent of the owners, has the means of knowing the state of navigation, the construction of his vessel, and the cost of performing the service, and is bound to determine whether he can afford to accept the proffered terms for the transportation of the goods. Masters are the agents of the owners, and as such have an implied authority to bind them, even without their knowledge, by contracts relative to the usual employment of the ship. "Owners," says a learned commentator, "rarely navigate their own ship, but almost always intrust its conduct and management to the master. They hold him forth to the world as authorized to contract, and by reason of their employment of the ship, and the profit derived by them from that employment, they are bound to the performance of every lawful contract made by him relative to the usual employment of the vessel." Abb. Shipp. (Ed. 1846) 156; 3 Kent, Comm. (9th Ed.) 220; Chit. Carr. (Ed. 1857) 225; The New World, 16 How. [57 U. S.] 473; Smith, Merc. Law, 559; Grant v. Norway, 10 C. B. 688. Possession of the cotton in this case was to be taken by the master at the cotton-press. His contract was to carry a specified number of bales, and to transport the whole parcel from one given place to another. In the strictest sense, therefore, it was by its terms an entire contract for the conveyance of a given quantity of goods. Sayward v. Stevens, 3 Gray, 97. Five sixths of the specified quantity had been taken from the cotton-press by the master, and was already on board the vessel. He employed the lighter in behalf of the vessel to bring down the remainder, and had agreed to pay for the service on account of the bark. Beyond question, it was a marine service which the lighter had engaged to perform, and she was in the employment of the master for the benefit of the vessel, and, in contemplation of law, was the agent of the owners in the performance of the service. Nothing can be more certain than that the service performed by the lighter was a marine service. She was required by the engagement to transport the cotton over navigable waters within the admiralty and maritime jurisdiction of the United States. Whether the water above the bar is more or less affected by the ebb and flow of the tide, it is nevertheless salt water, and is as much within the admiralty jurisdiction as the gulf itself, or the open sea. Her employment in no sense whatever emanated from the shipper. By the terms of the contract between the master and the shipper, the former as much agreed to transport the cotton over the twenty or thirty miles of navigable water, lying between the wharf and the anchorage of the vessel below the bar, as over any other part of the route from there to the port of destination. Whatever, therefore, the lighter did, in forwarding the cotton on the route, was a part-performance of the contract made by the master with the shipper, for which the owners were to receive compensation in the freight earned by the vessel. Freight could not be earned by the vessel, unless the cotton was first transported over this part of the route embraced in the contract. As the vessel could not perform the service, some other agency was absolutely indispensable to enable the vessel to earn freight, and by the usage of the port it was entirely competent for the master to employ a lighter. Had it been practicable so to do, the master might have sent his own boats, as an appendage of the vessel, to bring down the cotton; or, if that course was impracticable, unsafe, or inconvenient, he might employ other usual and customary agencies, as an accessory to the vessel for the time being to accomplish the same result, so as to enable him to fulfil his contract, and enable the vessel to earn freight. His contract bound him to accept the cotton at the cotton-press, and when it was placed on board the lighter in his employment for the purpose of being transported to the bark, the delivery to him was complete, and the liability of the vessel commenced. When it was placed on board the lighter as a substitute for the bark, the shipper had fully parted with the possession, and, having no longer any control or right of control over it, was in no degree responsible for its safe custody. All the obligations of due transport, safe custody, and right delivery at the port of destination, which constitute the duties of the carrier, had then attached. Whenever those obligations of the carrier begin, they carry with them all the rights and privileges incident and belonging to that relation. After such delivery by the shipper, the ship was bound to the merchandise and the merchandise to the ship, and the merchant could not recall the cargo or resume the possession without the payment of freight, unless by consent of the master. Contracts merely executory, where there has been no delivery of the goods to the master, or change of possession, stand upon a different ground. Unaccompanied by any delivery of the goods, the contract of the master for their transportation creates no lien upon the ship, and the contract cannot be enforced in the admiralty by a proceeding in rem against the vessel. Keeping in view this distinction, there will

be no difficulty in reconciling all the decisions bearing upon this question. Take, for example, the case of The Freeman v. Buckingham, 18 How. [59 U. S.] 188. In that case, the master had been fraudulently induced to sign bills of lading for certain merchandise, when none had been delivered, and when, in point of fact, the merchant had none such to be shipped, but had induced the master to sign them with intent to use them as instruments to obtain money from the libellant. He succeeded in his fraudulent purpose and obtained the advances. Failing to get back his money, the libellant instituted proceedings against the vessel. On that state of the case, the supreme court held that the vessel was not liable, and in enforcing the reasons for the conclusion, remarked that "the law creates no lien on a vessel, as the security for the performance of a contract to transport cargo, until some lawful contract of affreightment is made, and a cargo shipped under it;" but added in the same connection; that there was no cargo in that case, and no contract made for which the ship could stand as a security. Much reliance was also placed by the respondent upon the case of Vandewater v. Mills, 19 How. [60 U. S.] 90. It is insisted that the doctrine established by that case is, that the vessel and owners are never held liable on a contract for the transportation of goods, unless the goods are actually placed on board the vessel. Justice to the court requires that the facts of the case should be briefly noticed. As stated by the court, the libel set forth a contract between the owners of certain steamboats to convey freight and passengers between certain domestic ports. After the contract was executed, the owners of one of the steamers refused to employ their vessel according to the agreement, and sent her in another direction on a contract with other persons. For this breach of the contract, the libel was filed against the vessel, and the court held that the suit in rem could not be maintained. Among other things, the court remarked, that if the master or owner refused to perform his contract, or for any reason the ship does not receive cargo and depart on her voyage, the charterer has no privilege or maritime lien on the ship for such breach of the contract by the owners, but must resort to his personal action for damages as in other cases. No goods had been delivered in that case or offered for conveyance, and, of course, none had been injured or lost. Every remark in the opinion, as applied to the case then before the court, may well be reconciled with the view here taken of the present question. Damages were not claimed in that case for the failure to transport goods after their delivery to the master, or for their injury, deterioration, or loss in the voyage, but for the refusal of the owners to employ their vessel according to the contract; and in point of fact, the agreement had none of the features of a contract between the merchant and the carrier, for the trans-

portation of merchandise. In this case, the contract is between the merchant and the master, as the agent of the owners. Due delivery of the cotton to the master undoubtedly was made, when the goods were placed on board the lighter which he had employed in behalf of the bark for the purpose of transporting it to the vessel. Mr. Parsons says, the reception of the goods by the master on board of the ship, or at a wharf or quay near the ship, for the purpose of carriage therein, or by any person authorized by the owner or master so to receive them, binds the ship to the safe carriage and delivery of the goods. 1 Pars. Mar. Law, 132. Similar views are also expressed by Chancellor Kent. He says the responsibility of the owner begins where that of the wharfinger ends, and when the goods are delivered to some accredited person on board the ship. 3 Kent, Comm. (9th Ed.) 281. It was held by Lord Ellenborough, in Cobban v. Downe, 5 Esp. 41, that where the usage is to deliver the goods on the wharf to the mate of the vessel by which they are to be carried, such a delivery has the effect to terminate the responsibility of the wharfinger, and, in delivering judgment, he proceeded upon the ground that the liability of the ship commenced where the responsibility of the wharfinger ended. Reference is also made by the respondent to the case of Morewood v. Pollok, 18 Eng. Law & Eq. 341, as asserting a different doctrine; but there is nothing in that case inconsistent with the rule, that the goods, when placed in the lighter in the employment of the respondent, and for the purpose of being transported to the vessel, were duly delivered to him pursuant to the contract. All the cases agree that, so soon as a sufficient delivery of the goods is made to an authorized person, for the purpose of transportation, in pursuance of a lawful contract, the vessel is liable. Faulkner v. Wright, 1 Rice, 107; Greenwood v. Cooper, 10 La. Ann. 796; Clarke v. Needles, 25 Pa. St. 338; Snow v. Carruth [Case No. 13,-144]; Chit. Carr. (Ed. 1857) p. 228; Moll. de J. Mar. bk. 2, c. 2, § 2; Hosea v. McCrory, 12 Ala. 349; Trowbridge v. Chapin, 23 Conn. 595. That the owners of vessels are bound by the contract of the master when acting within the scope of his authority, is a proposition universally admitted. The Paragon [Case No. 10,708]; The Phoebe [Id. 11,064]; Hewett v. Buck, 17 Me. 147. As a general rule, whenever the owners are liable, the ship is also liable; and to such an extent has the rule been carried in some of the cases, that it is said that the liability of the ship and the responsibility of the owners are convertible terms. The Druid, 1 W. Rob. Adm. 399. Exceptions undoubtedly exist to that rule, but none of them have any application to cases of this description.

After full consideration of the case, I am of the opinion, that the decision of the district court was correct, and the decree there made is accordingly affirmed with costs.