Nicholson, C. J.,
delivered the opinion of the Court.
On the 2d of May, 1865, Thomas W. Wisdom, commenced his action in the Circuit Court of Montgomery county, against the Planters’ Bank, claiming damages to the amount of $5,000. The declaration filed at the May Term, 1865, contained several counts, two on a bank check in the following words:
$2,500. Plantees’ Bank oe Tennessee.
Office at Clarksville, February 15th, 1862. Pay to the order of Thomas W. Wisdom, Twenty-five Hundred Dollars. W. P. Hume, . Cashier.
To the Cashier of the
Union Bank of Louisiana, New Orleans.
*186 Two other counts were for money deposited, and for money had and received, etc.
Defendant filed several pleas, putting in issue its liability on any and every ground.
At the May Term, 1871, of the court, the cause was tried by the presiding Judge, upon the facts as well as the law, the parties agreeing to dispense with a jury. The Judge rendered judgment against the bank for $3,572.90, it being the amount of the cheek, with interest from the 29th of March, 1864, the date of the presentation of the check for payment. From this judgment the bank has appealed in error to this court. The facts developed on the trial, as far as they are important to be noticed, are as follows:
On the 15th day of February, 1862, Thomas "W". "Wisdom had a deposit, in the Planters’ Bank at Clarks-ville, amounting to $2,500. In anticipation of the fall of Fort Donelson and the occupation of Clarks-ville by the Federal military forces, the cashier of the bank had notified the depositors to come forward and withdraw their deposits. Accordingly, on that day Wisdom came forward,' and preferring exchange on New Orleans to Confederate treasury notes, the cashier gave to him the check sued on, at the same time balancing his account as a depositor, and crediting the amount to the Union Bank of Louisiana. At the date of the check, the Planters’ Bank had a deposit to its’ credit in the Union Bank of Louisiana, amounting to about $337,000. The check was not presented for payment at the Union Bank until the 29th of March, 1864, when payment was refused, because “the *187 amount which was to the credit of the office of the Planters’ Bank of Tennessee, Clarksville, was seized by Major-General Banks, and by his order paid over, ,10th of September, 1863, to A. Q,. M. Captain John McClure, U. S. A.” The amount so paid over was in Confederate treasury notes. In October, 1863, the Planters’ Bank drew checks on the Union Bank of Louisiana, for the balance then due it as shown by the books of the Planters’ Bank.
The Union Bank refused to pay, upon the ground that it had been compelled to pay the amount due the Planters’ Bank to the Federal military authorities. The Union Bank did not claim that the amount due the Planters’ Bank was in Confederate treasury notes until the Federal authorities demanded the money belonging to the Planters’ Bank and branches. Down to that time, the Union Bank had honored and paid all checks drawn by the Planters’ Bank, among them. several drawn on the 15th of February, 1862, the same day on which the check of Wisdom was drawn, and it is shown that if Wisdom’s check had been presented prior to September 10, 1863, it would have been paid.
In December, 1863, the Planters’ Bank sued the Union Bank of Louisiana in New Orleans, for $86,-657, that being the balance due, as appeared on the Planters’ Bank books. The declaration was afterwards amended so as to embrace the whole amount due as shown by the books of the Union Bank, leaving out the amount for which there were outstanding checks on the Union Bank.’ And in February, 1868, the *188 Planters’ Bank again amended its declaration, so as to embrace the outstanding checks, for the benefit of the holders thereof. These outstanding checks amounted, to $11,000.
This was done without any knowledge or consent of the holders of the checks, of whom Wisdom was one. Upon the trial of the suit the Planters’ Bank recovered a judgment against the Union Bank for $125,000. On a motion for a new trial, the same was granted, on condition that the Union Bank would pay the amount of $26,752, admitted on the trial to be due. This amount, with interest, making $31,391, was paid in July, 1868, and a new trial granted. On the next trial, at January Term, 1871, the Planters’ Bank recovered a judgment for $26,773, from which judgment the Planters’ Bank appealed to the Supreme Court of the United States, where the suit is now pending.
The proof shows, that the Union Bank resisted the claim of the Planters’ Bank upon the ground that the amount claimed was in Confederate treasury notes, and that the same was paid over, under military orders, to the Federal authorities. It appears, however, that on the trial of the suit, the Union Bank admitted its liability $26,752. It appears, also, that down to the time when the military authorities demanded the money, to-wit, September 10, 1863, the Union Bank had never claimed that the deposit of the Planters’ Bank was in Confederate money, but had paid all checks drawn by the Planters’ Bank, without claiming the right to pay them in Confederate money. It appears that of the *189 $26,752 admitted by the Union Bank to be justly due on the trial, $10,331 was due the branch bank at Memphis, for collections, before the existence of Confederate money, and $16,421.61 was due the branch at Clarksville, for collections in other than Confederate notes. It further appears that the Union Bank had special instructions from the Planters’ Bank as to' receiving Confederate notes, nor was such money collected and held on deposit for the Planters’ Bank.
It is further in proof, that on the 2d of May, 1863, the Planters’ Bank requested the Union Bank to invest the amount due it, in New York exchange, and to remit to the Manhattan Co. Bank at New York, to the credit ’of the Planters’ Bank, to which request the Union Bank acceded, and in June and July, 1863, did so invest and remit about $27,000. It is shown that the Union Bank of Louisiana has been at all times, and is now, solvent and in good standing.
It is in evidence, that Clarksville was taken possession of by the Federal military authorities on the 20th of February, 1862, and New Orleans in April, 1862, both of which places continued under Federal authority during the war.
Mail communication between Clarksville and New Orleans was restored about June 18, 1862, but was interrupted in August, 1862, for a short time, and was then restored again.
Upon these facts several questions arise for our determination.
1. Was the presentation of the check on the 29th *190 of March, 1864, sufficient to fix liability upon the drawer thereof?
2. If the check was not presented within the time required by law, can the holder make the drawer liable, by showing that he sustained no injury in consequence of the delay in making the presentation?
3. If the drawee continued solvent until the check was presented, has the drawer shown such injury in consequence of the delay of the holder in presenting the pheck, as will release the drawer from liability.
We will examine these questions in the order stated.
But before proceeding to this examination, it is proper for us to remark, that we "have carefully looked into the several authorities to which we have been referred, on the question, whether the instrument sued on is a bill of exchange or a bank check. Mr. Edwards, p. 56, says that bank checks are in substance bills of' exchange payable on demand. They are sometimes said to resemble bills of exchange; but they are in truth a species of bills. He says it is essential to a check eo nomine, that it be payable on demand. It is generally made payable to bearer, but its character is not changed by the fact that it is made payable to the order of the person to whom it is given. While therefore it is true that the instrument sued on falls within the general definition of a bill of exchange, it is also true, that it falls within that species of bills known in commercial nomenclature as bank checks. It may be, and probably is, impracticable to lay down any one unerring test by which a bank check may *191 be distinguished from a bill exchange; yet it is certain that the authorities recognize such a distinctive species of commercial paper, and lay down the rules of law and commercial usage which have grown up and become authoritative in determining the rights and liabilities of the parties to these instruments: Syracuse R. R. Co. v. Collins, 3 Lansing, (N. Y.) 29; 10 Wah, 152. Upon looking to the circumstances under which the instrument under consideration was given, we can not doubt that it was intended by the cashier of the Planters’ Bank as a convenient mode of transfering so much of its deposits in the Union Bank of Louisiana as would pay the debt due to the depositor. The cashier in his testimony speaks of it as a check, and not as a bill of exchange, and in like manner, the depositor who received it denominated it a check, thus showing that the parties themselves understood the instrument to be a bank check, and not a bill of exchange.
1. The instrument sued on falls within the general definition of a draft or bill of exchange. It is a written order or request by the Planters’ Bank to the Union Bank for the payment of $2,500, absolutely and at all events. But as it is drawn upon a deposit in a bank, it falls directly within that class of bills of exchange known in the commercial world as checks. Mr. Parsons defines a check to be a brief draft or order on a bank or banking house directing it to pay a certain sum of money: 2 Par. N. &. B., 57.
Mr. Edwards says: “Although the current decisions in this State seem to warrant a distinction between *192 check and a bill, in regard to the effect of omitting to present the same to the drawer within a reasonable time, it is very clear that the drawer of a check, as well as the drawer of any other bill or draft, is discharged, if in consequence of unreasonable delay in presenting' the check an injury or loss is sustained by him. It is also clear that in an action against the drawer of a check, the holder can not in general recover unless he shows that it has been presented for payment and dishonored, and that notice of non-payment has been properly given. But the holder of a negotiable check, in order to charge the drawer, has not been generally held responsible for the use of the same degree of diligence as the law requires of the holder of an ordinary bill of exchange. Unless the bank on which the check is drawn fails before it is presented for payment, the drawer lose nothing by the delay:” Edwards on Bills, etc., 376; Little v. Phenix Bank, 2 Hill R., 425, S. C.; 7 Hill R., 539; Harkee v. Anderson, 21 Wend. R., 372; Murry v. Judah, 6 Cowen R., 484; Morrison v. McCarty, 30 M; 9 Jones, 183.
Mr. Parsons says: “A check must be presented in a reasonable time, in order to charge the drawer or indorser in case of the failure of the drawer.” He adds: “Where there is no presentment of the check, or no notice, there is of course a presumption of injury to the drawer; but the presumption is not absolute, and may be rebutted by proof that the check was not drawn against funds,' or that the funds were removed by the drawer before presentment.” And *193 again: “As between the holder and the drawer, it seems well settled, although not without some dissent, that the drawer is not discharged by any delay of presentment whatever, unless he can show that he has been injured thereby,. as by failure of the drawer, or change in the state of accounts or otherwise:” 2 Parsons on N. & B., 72, 74. In his work on Mercantile Law, p. 90, Mr. Parsons says, “nor can the drawer complain of any delay whatever in the presentment, for it is an absolute appropriation, as between the drawer and the holder, of so much money in the hands of the banker; then it may lie at the holder’s pleasure. But delay is at the holder’s risk, for if the bank fail after he could have got his money on the check, the loss is his.”
Where the parties all reside in the same place, the check should be presented the same or the next day after it is received. If payable at a different place, it should be forwarded the same or the next day: Edwards on Bills and Notes, 378; (note.)
Ifc^ffollows from the several authorities referred to, that unless there are unavoidable obstacles preventing it, the holder of a check is guilty of negligence if he fails to present it, or forward it, on the same or the next day. If the presentment be not thus made, the presumption of injury from the negligence of the holder arises, and the onus of showing that no injury has resulted from the delay to the drawer, rests on the holder. If the holder succeeds in showing that no injury has resulted from the delay, then the presumption of law is rebutted, and the drawer is responsible. *194 In the language of Mr. Edwards, p. 378, “the cheek is always presumed to be drawn on actual funds, and if the holder has been guilty of laches, in not presenting it in due time, it is incumbent upon him to show that the drawer has not been, injured by the delay, and if he shows that the drawer has himself drawn out the fund against which he drew the check, the burden of proving actual damage is shifted upon the drawer:” Conroy v. Warren, 3 John. Cas., 259.
To this we think it may be added as a sound rule, that when the holder has rebutted the presumption of injury arising from laches in presenting the check in due time, by showing that the drawee was solvent when the check was presented, then the burden of proving actual damages is shifted upon the drawer. In the case before us the check was drawn on the 15th day of February, 1862, and was not presented until the 29th of March, 1864. The proof shows that the check could have been earlier presented, and that other checks drawn at the same time were so presented. No unavoidable obstacle is shown to have prevented the holder from presenting his check, and therefore he was guilty of laches, from which the presumption of injury to the drawer arises.
It follows that the presentment of the check on the 29th of March, 1864, was not sufficient of itself to fix liability upon the drawer.
2. But the plaintiff has shown that the Union Bank continued to be solvent from the time the check was drawn in February, 1862, until it was presented *195 in March, 1864, and has continued solvent to the present time.
This proof rebuts the presumption of injury arising from the laches of the holder, in failing to present the check in due time. This proof was sufficient to raise the presumption that the drawer sustained no injury from the delay, and must fix the liability upon him, unless he has shown actual damage in consequence of the delay. Mr. Story, in his work on Promisory Notes, 497, lays down the rule, that “when in the intermediate time between the. drawing of the check, and the presentment thereof for payment, there has been a change of circumstances materially affecting the rights and interests of the drawer, in respect to the bank or banker on whom the check is drawn; the check must have been presented in the reasonable time required by law, otherwise the drawer will be released.”
3. This brings us to the real question on which the case must be determined.
Has the drawer shown that he sustained actual damage by the delay of the holder of the check in presenting it, or which is the same thing, has he shown a change of circumstances materially affecting the rights and interests of the drawer? It is shown by the plaintiff that when suit was brought against the Union Bank in December, 1863, the bank insisted that it had handed over all the deposit of the Planters’ Bank to the Federal military authorities, and that all of this deposit was in Confederate money. But that on the first trial of the cause, the Union Bank ad *196 mitted that of the whole deposit there was $26,652, which was not Confederate money, and for which the bank was responsible. It further appears by the proof of the Planters’ Bank, that of this $26,752, upwards of $16,000 was derived from collections in funds other than Confederate money, for the branch of the Planters’ Bank at Clarksville. It follows clearly, that when the holder of the check in suit presented it in March, 1864, for payment, the Union Bank then had on hand a deposit of $26,752, of which upwards of $16,000 belonged to the branch at Clarksville, which had given the check. Yet, the Union Bank refused to honor the check, upon the false reason that it had no funds belonging to the Planters’ Bank, and that it had all been handed over in Confederate money to the military authorities. It is further shown by the evidence of the Planters’ Bank, that this $26,752 has been paid over to that bank, and it still has a suit pending for the balance of the deposit.
The Union Bank is resisting payment on the ground that the balance of the deposit was in Confederate money, and the Planters’ Bank proves in this case that none of it was Confederate money.
Do these facts, proven by the Planters’ Bank, show that it sustained any injury by the delay of the holder of the check in presenting it for payment? It can not be said that the failure of the holder of the check to present it before the 10th of September, 1863, had any influence in inducing the military authorities to seize the deposit; nor did the failure to present the check produce any change in the circumstances affect *197 ing the rights or interests of the Planters’ Bank in regard to the Union Bank; nor did this failure to present superinduce any injury to the Planters’ Bank, unless it was an injury to the bank to have to prosecute its suit for that much more than it would have done if the check had been presented and paid.
The proof does show, inferentially, that if • the check in suit here had been presented before September 10, 1863, it would have been paid. This payment would have been made in good funds; for it is in proof by the bank that all the other checks had been paid in good funds, and that the Union Bank never claimed that the deposit was in Confederate money until September 10, 1863, when it was demanded by the military authorities. If then the cheek in suit had been presented, and paid it would have reduced the amount admitted by the Union Bank to have been in its hands from $26,752 to $24,202, and the Planters’ Bank would have received this latter sum instead of the former. How then is the bank injured? The amount which would have been paid if the check had been presented, has since been paid by the Union Bank to the Planters’ Bank. We are therefore unable to see what injury the Planters’ Bank has sustained by the delay.
But the proof of the Planters’ Bank shows.that of the amount paid to it by the Union Bank, after suit was commenced, upwards of $16,000 was admitted by the Union Bank to have been collected for the Clarks-ville branch. " It is difficult to comprehend the principle of justice or equity on which the bank can claim *198 to hold on to this amount and resist the claim of the check drawn on this very fund.
It is further to be observed that during the pen-dency of the suit with the Union Bank, the Planters’ Bank voluntarily amended its declaration so as to include in its claim the check now in suit, thus distinctly recognizing the check as a subsisting claim upon the deposit sued for, and virtually acknowledging its liability to pay the same. We cannot appreciate the force of the suggestion, that the holder of the check should wait until the termination of the litigation of the two banks, and if the Planters’ Bank should be successful, then the check-holder may have a right to sue the bank for money had and received.
We think the bank has already received the fund out of which the check-holder has a right to have his claim satisfied.
Again, it is shown by the proof of the Planters’ Bank, that when the plaintiff presented his check for payment in March, 1864, the Union Bank was guilty of a fraud in refusing to honor the check; that it had funds in hand belonging to the Planters’ Bank, but they were withheld upon a false and fraudulent pretence of having paid them over under' military orders.
This is the case made out in the present suit by the defendant’s proof; it is the case sought to be made out in the suit pending against the Union Bank. It will be observed that the Union Bank was the agent of the Planters’ Bank, and the plaintiff took the check from defendant’s agent under the implied *199 legal guaranty that the’ agent -would faithfully pay over the funds according to the order of the principal. This the agent has failed to do, and the principal now seeks to escape responsibility by showing that its own agent has wrongfully withheld the funds. The ■ Planters’ Bank repudiates and denies the sufficiency or • the truth of the reason given by the Union Bank for dishonoring the check, and proves clearly that in so doing the Union Bank, acting as its agent, was guilty of a fraud. It would be monstrous to allow a principal thus to avoid responsibility by showing that its agent had proved unfaithful in the execution of its trust: 1 Salk, 289; DeVoss v. Richmond, 18 Grattan, 338.
The check-holder has no remedy against the unfaithful agent of defendant. It is well settled that the check-holder has no right of action against a drawer upon refusal to pay the check: 2 Par. N. & B., 60, 61; 10 Wal., 152. His remedy is against the drawer alone. He loses this remedy by unreasonable delay, unless it is shown, as in this case, that the drawee is solvent, and that the drawer has sustained no damage. But if the drawer can escape by showing the unfaithful or fraudulent refusal to pay by his agent, then the drawer may sue and recover from the agent, and the check-holder is without any remedy.
We are therefore of opinion that the judgment of the Circuit Court was correct, and we affirm it.