## ROBINSON, McLEOD & Co. *v.* MEMPHIS & CHARLESTON R. Co.

*(Circuit Court, W. D. Tennessee, E. D.* October 24, 1881.)

1. FRAUDULENT BILL OF LADING — COMMON CARRIER — NEGOTIABLE INSTRUMENTS — COLLATERAL SECURITY — FACTOR'S ADVANCES — INNOCENT HOLDER — ESTOPPEL — PRINCIPAL AND AGENT.

   The freight agent of a railroad company, by the procurement of a cotton buyer, signed a bill of lading for 32 bales of cotton which were not on hand, and were never delivered to the railroad company or any agent for it. The plaintiffs paid a draft for the price of the cotton on the faith of the bill of lading attached to it and indorsed to them, and never having received the cotton sued the railroad company for its non-delivery. *Held,* that the carrier was not estopped to show that no cotton was in fact delivered for transportation; that the agent had no authority, real or apparent, to sign a receipt or bill of lading until actual delivery of the cotton, and the company was not liable.

2. SAME SUBJECT — CUSTOM — COMMERCIAL USAGE.

   Neither a general nor local custom to use bills of lading as collateral security for drafts drawn against the merchandise can alter the rules of law governing the contract of the parties. This use of bills of lading is one in which the carrier has no interest, and he cannot be charged with an extraordinary liability *dehors* the contract for which he receives no compensation or indemnity, merely to assure other parties against loss by the fraudulent dealings of those who so use them. It is not in the interest of commerce to impose this liability upon the common carriers of the country.

3. SAME SUBJECT — PLEADING — ACTIONS — WHO MAY SUE — INDORSEE — TENNESSEE CODE, § 1967.

   The indorsee of a bill of lading for value may not only sue for the goods, but he may, in his own name, sue the carrier for non-delivery. Bills of lading are *quasi* negotiable to that extent, and particularly so under the Tennessee Code, § 1967.

### On Demurrer.

Plaintiff's declaration, in its first count, claims damages for a failure to deliver in the city of New York 32 bales of cotton which the defendant corporation undertook to deliver by its bill of lading. The second count declares upon the special facts, which are stated to be that—

"The plaintiffs are and were engaged in a general cotton commercial business in the city of New York; that one J. S. Chiles was a cotton buyer residing in the city of Jackson, Tennessee; that the defendant was a common carrier by land, with an office or agency in said city of Jackson; that the means by which cotton was shipped from Jackson to the markets of the eastern cities for sale was by the advancement of money to the cotton buyer in Jackson by the plaintiffs and other merchants engaged in like business; that the usual and customary mode of obtaining such advancements was by drafts drawn by the shippers of cotton for the value of the cotton shipped; that the usual and customary mode of securing such advances was by obtaining and procuring bills of lading from the defendant and other common carriers by land for the cotton so shipped; that it was the usual and customary mode and manner of the defendant and other common carriers to execute and issue bills of lading, by

and in which it was contracted, for a reward, to deliver the cotton mentioned and described in the bills of lading to the shipper or his order, at the point of destination; that, upon the making and drawing of the drafts before mentioned, it was the usual and customary mode of inducing and obtaining the payment of money on such drafts, for the shippers of the cotton and holders of the bill of lading to indorse the same deliverable to the order of the holder of such drafts, and attach the same to the drafts so drawn, as security against loss by the holder of the drafts; that at various and sundry times before the ninth of June, 1879, the said Chiles had shipped cotton by the defendant as a common carrier from Jackson, and the defendant at such times did make and cause to be issued to him bills of lading, in manner and form as hereinbefore described; that said bills of lading so issued to said Chiles contained in writing, on their face, directions to notify the said plaintiffs of the arrival of such cotton in the city of New York; that, upon the receipt of such bills of lading so made and issued before June 9, 1879, the said Chiles drew his draft upon the plaintiffs for the value of the cotton in said bills described, and did indorse the same and attach them to the said drafts; that, upon the faith and credit of the security so given by attaching such bills of lading so made, issued, and indorsed, the said Chiles was enabled, and did, discount his said drafts, and procure and obtain the money from the local banks at Jackson; that, relying upon the said security, the plaintiffs paid the drafts on presentation; that the drafts were intended to be, and in fact were, presented long before the delivery of the cotton described in the bills of lading so attached; that the usual and customary mode of moving the cotton from Jackson, and the course of dealing between the plaintiffs and said Chiles, was well known to the defendant; that, on the seventh day of June, 1879, the defendant made and caused to be issued the bill of lading now to the court shown, to said Chiles, in and by which the defendant acknowledged the receipt of 32 bales of cotton in apparent good order, marked as described in said bill of lading, and contracted, agreed, and bound itself to deliver said 32 bales of cotton to the said Chiles or his order, in the city of New York; that the common carrier aforesaid (the defendant) would notify the plaintiffs of the arrival of the cotton in New York; that the cotton was of the average weight of 500 pounds per bale and was worth the sum of 15 cents per pound; that, on the said seventh day of June, 1879, the said Chiles drew his certain draft of that date in favor of the Bank of Madison, of said city of Jackson, addressed to the plaintiffs and payable at sight, for the sum of $1,777.12, which said draft is now here to the court shown; that the bill of lading last above mentioned was attached to said draft, with the order of said Chiles indorsed thereon, to deliver the said cotton to N. S. White, the cashier of said bank, or his order; that the draft was, upon the faith of the security of the bill of lading aforesaid, so attached to the draft and indorsed as aforesaid, discounted by the bank, and sent to the correspondent of the bank in New York for collection; that the draft, with the bill of lading attached, and further indorsed that the cotton be delivered to the plaintiffs, was presented to them for payment, and they, relying upon and confiding in the security made by said bill of lading, and upon the faith and credit thereof, paid the same; and that the cotton, or any part thereof, has never been delivered to the plaintiffs according, etc., although, etc., to their damage, etc."

To this declaration the defendant company pleads that—

"It did not undertake," etc. "(2) The bill of lading was given, executed, and signed without any authority from the company, and the same was false and fraudulent, because the 32 bales of cotton, nor any part thereof, were never delivered or came to the hands of the defendant, or to any person authorized to receive, receipt for, or give a bill of lading, and this," etc. "(3) That the cot-

ton mentioned, nor any part thereof, was never delivered or came into the possession of defendant, or any of its agents, for transportation or for any other purpose, wherefore the bill of lading is false and fraudulent, and was issued without authority from the defendant," etc.

To these pleas the plaintiffs demur, except to the first, on which issue is joined. The grounds of demurrer are stated to be that—

"(1) The pleas are not sufficient in law," etc. "(2) They do not aver that the defendant did not contract and agree to deliver," etc., " as alleged in the declaration. (3) They do not aver that the defendants did not make, execute, and issue the bill of lading. (4) They do not show such a state of facts as will prevent a recovery. The facts averred in the declaration estop the defendants from denying the actual receipt of the cotton," etc.

*Freeman & McCorry* and *Muse & Buford,* (of Jackson, Tenn.,) for plaintiffs.

*Campbell & Jackson ,* (of Jackson, Tenn.,) for defendant.

HAMMOND, D. J.    No technical objections·have been raised as to the form of any of the pleadings in this case, nor has the case been strictly argued on the facts as they appear by the pleadings. The difficulty is that the second and third pleas are not special pleas, stating the particular facts, and amount to no more than the general denial of the first, on which issue has been joined. Of course, if the bill of lading "was given, executed, and signed without authority from this defendant," and the demurrer admits this, there can be no recovery in any view of the case; but the allegation amounts to no more than that of the first plea, that the company "did not contract, undertake," etc. Nor is the statement contained in these pleas, that the cotton was never delivered to the company, anything more than this general denial of the first plea; for neither of the pleas admits the bill of lading to have been signed by an agent of the company who would have been authorized to sign it if the cotton had been delivered, although that important fact has been assumed in the argument. The allegation of these pleas, that the bill of lading was "false and fraudulent," is a mere conclusion of law, based upon the other allegations that it was issued without authority, and that no cotton was delivered for transportation. The court understands from counsel on both sides that there was an agent of the defendant company at Jackson authorized to sign bills of lading when cotton was actually delivered to him, or the company's other agents, for transportation,—the defendant contending that this was a special agency arising only on actual delivery of cotton, while the plaintiff treats him as a general agent of the largest powers; that this man Chiles, either by collusion with this agent or by false representations to him, procured him to sign the bill of lading in controversy without any act-

ual delivery of the cotton, attached it to the draft as stated in the declaration, negotiated them as alleged, but never delivered any cotton to the company. This is the case that has been argued, but it is readily seen that it is not precisely the one presented by the record. Inasmuch, however, as counsel have treated these pleas as if the facts stated to the court were contained in them, and seem desirous of taking the judgment of the court on those admitted facts, I shall so treat the case, but will require a special plea to be added, stating the facts something in the form indicated, and reserve the right, if I have mistaken them, to reconsider the case on those to be stated in the plea, or to render the judgment demanded by the record as it now stands.

It will be seen, from this statement of the facts and those contained in the pleadings, that the question is whether or not a common carrier is liable for damages sustained by the indorsee of a bill of lading, issued by its agent, binding it to deliver merchandise never in fact delivered to the carrier for transportation, where there is an allegation of special damage sustained by reason of the fact that the indorsee has advanced money on the faith of a receipt of the goods by the carrier, as expressed in the bill of lading. That the plaintiffs believed this cotton was in the hands of the carrier, as certified by its agent, under a contract to deliver it to the order of Chiles, there can be no doubt. I cannot see that it is material whether this agent trustingly confided in the misrepresentations or promises of Chiles, or whether he fraudulently conspired with him to do the wrong. The question is, who shall suffer the loss, the railroad company or the plaintiffs? If I may use the language of Mr. Justice Field:

"The question involved is one so often unfortunately raised in courts of justice as to which of two innocent parties is to suffer by the dishonest dealing of a third, and the only course open to a court in such case is to ascertain upon which of the parties the loss is cast by the operation of the rules of law applicable to the case, and decide accordingly. In this action the question is one of considerable mercantile importance, and I have taken time to consider the authorities applicable to it, but the legal result of the facts has always seemed and now seems to me plain." *Glyn* v. *E. & W. India Dock Co.* 5 Q. B. D. 129, 132.

But, notwithstanding this seeming confidence, the judgment of that learned court was, as the one I am about to give may be, reversed on writ of error, and the case is, though not precisely like this, very instructive here. The shipper and consignee received from the master three bills of lading,—or rather one bill of lading in three parts, as is sometimes customary,—marked

"first," "second," and "third." The first he indorsed to the plaintiffs for advances made, and afterwards, the goods being entered at a warehouse in the shipper's name, he dishonestly gave orders to other persons for the goods, assigning the "second" part of the bill of lading, upon which the goods were delivered. The plaintiffs sued the warehouseman, and the queen's bench division gave judgment for the value of the goods. That court calls attention to the fact that the carrier would not have been liable, though the concession is somewhat reluctantly made, because he was not bound to settle conflicting claims, and might deliver the goods to an apparent owner holding either part of the bill of lading. I have not seen the report of the judgment of the court of appeal reversing the queen's bench division, but it must have been on the ground that the warehouseman was equally protected with the carrier. 15 Am. Law Rev. (N. S.) 156. I cite the case to show that while the law holds a carrier to a very rigid and often harsh degree of liability for the performance of his contract *qua* carrier, it does not readily impose any outside liability or embarrassment upon him. And this is in the interest of commerce, and in pursuance of that public policy which encourages the unembarrassed transportation of goods by common carriers. Their business is that of transportation, and they are not engaged in issuing bills of lading as negotiable securities, to be used as such for the convenience of bankers, brokers, and commercial men. A bill of lading is issued primarily as an evidence of their executory contract to carry, and the acknowledgement of the receipt of the goods for that purpose is only incidental,—the mere averment of a fact for the purpose of founding thereon the contract to carry. Now, commercial men have, from time immemorial, for their own advantage, and not at all for that of the carrier, let it be remembered, treated these documents as convenient symbols or muniments of title, and as instruments of transfer of title, and they have, for that purpose, acquired among them a *quasi* negotiability or capacity to pass from hand to hand by indorsement. But the carrier is not at all benefited by this, and it is not for his gain that it is done. Mr. Justice Clifford defines a bill of lading thus: "Such an instrument acknowledges the bailment of the goods, and is evidence of a contract for the safe custody, due transport, and right delivery of the same, upon the terms as to freight therein described, the extent of the obligation being specified in the instrument." *The Delaware*, 14 Wall. 579, 596.

It seems to me, with all deference, that it is a misapprehension of

the true character of this instrument, and of the true relation of the
parties to it, to treat it as if the maker were engaged in the business
of issuing negotiable securities, which he is bound to protect at all
hazards in the hands of a *bona fide* purchaser for value; or, as it is
expressed in argument here, to protect those who innocently and
in good faith deal with it. This entails a liability *dehors* the con-
tract. It makes the carrier an insurer or guarantor of strangers to
the contract against loss incurred by a use of the instrument in which
the carrier has no interest, and binds him to a liability for which he
is not paid; for the comparatively small sum he receives as compen-
sation for carriage will not, and is never intended to, cover or insure
him against loss incurred by such a liability as that. The considera-
tion he receives is not commensurate with the liability sought to be
imposed, and if it is determined to exist carriers must necessarily add
to the freight a sum sufficient to indemnify them, as insurance com-
panies are; and this for the protection of outside parties dealing in
matters not pertaining to the carriage of the goods. Moreover, it
obstructs the carrier in his proper business, and entails upon him
the selection of agents possessing not only the ordinary mental and
moral qualifications essential to the receiving, handling, and carriage
of merchandise, but those having the relatively higher qualifications
required of bank cashiers or other agents entrusted with the duty of
issuing, signing, and handling bank notes, negotiable bonds, or like
securities. It does not seem to me in the interest of commerce to
compel carriers either to so increase the rates of compensation or to
confine them to the selection of agents as banks and trust companies
are confined.

And these considerations cannot be overlooked or overborne by the
supposed benefits of having the commercial world supplied with an
assurance against inconvenience in their dealings, not with the car-
rier, but each other. To illustrate by this case, it is plain that the
Bank of Madison, when it discounted the draft and took the bill of
lading, could have known, being in the same town, by sending a mes-
senger to the agent, depot, or warehouse of the company, that this
was a false bill of lading. So, although these plaintiffs in New York
could not so readily have ascertained that fact, they could have pro-
tected themselves by refusing to accept the drafts until the cotton had
arrived, or until by telegraph they had assured themselves of the
existence of the cotton. 16 Am. Law Reg. (N. S.) 1. They both, no
doubt, trusted more to the ordinary honesty of human nature and the
particular honesty of Chiles, than they did to this bill of lading, or

at least as much; and, at all events, the person who signed the bill of lading trusted to that honesty, if he was not *particeps criminis*, and I do not see why one should lose more by the trust than the other. And in this connection it must be remembered that Chiles was the plaintiffs' regular customer. *Hoffman* v. *The Bank, etc.,* 12 Wall. 181, at p. 190. Certainly, in my judgment, an extraordinary liability so beyond the scope of the actual contract of the carrier, and beyond the general business he is engaged in, should not be imposed to save a bank from the inconvenience of sending a messenger a few squares in the same town, or yet to expedite by a few days or moments the dealings between a cotton factor and his customer, upon any theory that it is in the interest of commerce to do this. A factor must attend to the honesty of his customer, and so a bank; and they should know that a common carrier is confined to the business of carrying goods actually delivered, has no liability till they are delivered, and that delivery and not the signing of the bill of lading is the initial point of the contract and the liability.

Mr. Justice Willes said, in a case involving a fraudulent dealing with a bill of lading, that—

"Arguments founded upon the notion that the court is to pronounce a judgment in this case which will protect those who deal with fraudulent people are altogether beside the facts of this case and foreign from transactions of this nature. To attempt such a task would be idle; to accomplish it, impossible. We must apply our minds to the facts of the case before us, and see what is their true bearing, and what is the proper conclusion we ought to arrive at in respect to the litigant parties, without considering what may hereafter happen to persons who omit to use diligence and consequently to have the misfortune to be overreached."

And this was emphasized, when the case went to the house of lords, by Lord Chancellor Hatherley, in language I forbear to quote, only because it requires space to present it properly. *Meyerstein* v. *Barber,* 2 C. P. 38, 51; S. C. 4 H. L. 317, 332. The holder of the first two parts of a bill of lading, who had made advances on it, sued, in that case, the holder of the third part, who had in good faith, relying on the bill of lading, purchased the goods, and recovered their value, notwithstanding the argument just alluded to, which is the same suggested by the averments of the declaration and pressed in argument here. The principle established is that because others may deal fraudulently with bills of lading furnishes no ground for the court, in the supposed interest of commerce, to disregard the ordinary rules governing the contract of the parties in order to protect those who

carelessly neglect to take the precautions that would protect themselves.

The rule contended for would make bills of lading in this respect negotiable, like bills of exchange or other representations of money, which they are not. 2 Daniell, Neg. Inst. (2d Ed.) §§ 1727, 1751. Mr. Justice Strong puts this claim for them at rest when he says:

"The function of that instrument is entirely different from a bill or note. It is not a representation of money used for transmission of money, or for the payment of debts, or for purchases. It does not pass from hand to hand, as bank notes or coin. It is a contract for the performance of a duty. True, it is a symbol of ownership of the goods covered by it—a representation of those goods.  *  *  *  Bills of lading are regarded as so much cotton, grain, iron or other articles of merchandise. The merchandise is very often sold or pledged by the transfer of the bills which cover it. They are, in commerce, a very different thing from bills of exchange and promissory notes, answering a different purpose and performing different functions. It cannot be, therefore, that the statute which made them negotiable by indorsement and delivery, or negotiable in the same manner as bills of exchange and promissory notes are negotiable, intended to change totally their character, put them in all respects on the footing of instruments which are the representations of money, and charged the negotiation of them with all the consequences which usually attend or follow the negotiation of bills and notes. Some of these consequences would be very strange, if not impossible, such as the liability of indorsers, the duty of demand *ad diem*, notice of non-delivery by the carrier, etc., or the loss of the owner's property by the fraudulent assignment of a thief." *Shaw* v. *Railroad Co.* 101 U. S. 557, 564.

If a statute like that described by the learned justice does not so result, how can a careless belief of the plaintiffs in this case, that this bill of lading was what it purported to be, have the effect of subjecting the carrier to the same liability as if it had issued a bill of exchange or promissory note without receiving the consideration for it? Or the same result as if an agent, authorized to sign its notes, had executed and negotiated one on his own account to defraud the principal? *Lowell Bank* v. *Winchester*, 8 Allen, 109.

Nor do I see why the local or special custom averred in this declaration, or any general custom of dealing with bills of lading as if they possessed this element of negotiability, should give it to them as against the carrier, or enlarge his liability on them. Whart. Ag. §§ 134, 675, 676; *The Reeside*, 2 Sumn. 567, 569; *Turney* v. *Wilson*, 7 Yerg. 340; 6 So. Law Rev. (N. S.) 845; *The Delaware*, 14 Wall. at pp. 602, 603; *Blakemore* v. *Heyman*, 6 Fed. Rep. 581.

The most plausible argument in favor of the plaintiffs is that the carrier, having authorized an agent to sign bills of lading, is estopped

to deny the receipt of the cotton when the bill of lading has passed into the hands of an innocent party, and should be held precisely as if it had received the.cotton and failed to deliver it to the plaintiffs. I doubt whether a factor and his principal occupy such a relation to each other in their dealings as will justify either in saying of their common or mutual carrier that he is the carrier for the other, so as to take the case out of the category of one between the original parties where there is not the least doubt that the carrier is not estopped to explain his receipt by showing it to be a false one or only partially a true one. *The Lady Franklin,* 8 Wall. 325. But, passing that question, there can be no doubt that one should not be estopped by the conduct of another, unless that other is acting for him in the premises. Big. Estop. 442; Id. 429; Whart. Ag. 127–139; 13 Am. Law Reg. (N. S.) 657; *Planters' Bank* v. *Merritt,* 7 Heisk. 177; *Merchants' Bank* v. *State Bank,* 10 Wall. at p. 675. It is sometimes said that the principal is estopped where the agent acts within the *apparent* scope of his authority, and this may be conceded here. But this railroad company did not authorize this agent to sign false or fictitious bills of lading. It said to the community: We are engaged in carrying merchandise to New York or elsewhere, over our lines, and we placé this man here to receive such as you have for transportation, and authorize him to give you a receipt for it and a written contract stipulating for its transportation. They did no more than this, and no more can be fairly inferred from what they did. It was not within the apparent scope of this authority to sign and issue documents for the mere purpose of having them attached to drafts or otherwise pledged as collateral security, irrespective of the actual possession of goods to be carried. It may well be doubted whether the directory itself, or the body of the stockholders even, could authorize the company to issue bills of lading without the merchandise in hand to be used for any purpose. The charter does not authorize such a business, and the company is not engaged in it. Therefore, it seems to me plain that the agent's authority, actual and apparent, was limited to issuing bills of lading on goods in hand, and all else was outside the agency, unless we are to treat these documents as against the carrier just as if they were as negotiable in this respect as bills and notes, which we have seen we are not authorized to do. Indeed, a bill of lading is not necessary at all, and the carrier's liability is fixed by delivery of the goods without it. *Fox* v. *Hall,* 36 Conn. 558; S. C. 4 Ben. 278; *Shelton* v. *Merchants' Co.* 4 J. & S. (N. Y.) 527; Hutch. Car, §§ 118,

729. A general railroad agent may sometimes bind the company within the general scope of its own powers, but not a mere station agent, freight receiver, or conductor. *Atlantic, etc., Railroad* v. *Reisner,* 18 Kan. 458; Whart. Ag. § 222; Id. §§ 57–59, 129; 172, 478, 670, 671, 677; Story, Ag. § 69; *Cox* v. *Midland R. Co.* 3 Exch. (Wils., Hurl. & Gord.) 268.

The case of *Farmers', etc., Nat. Bank* v. *Erie R. Co.* 72 N. Y. 188, illustrates the class of acts within the scope of the authority of this kind of agent, and shows where the corporation is liable for their neglect. It was a bill of lading issued to the wrong person on goods received, and the carrier was liable to the rightful owner notwithstanding it delivered to this fraudulent consignee. Of course, the company did not authorize an agent to issue to a wrong person, but having received the goods of the rightful owner its liability was fixed, and the agent was neglectful within the scope of his authority over the goods. It was his business to deliver to the rightful owner, and it was negligence to deliver to another. Signing the bill of lading to the wrong person was only an incident of that neglect. Another illustration is found in *Bradstreet* v. *Heran,* 2 Blatchf. 116, where a master signed a bill of lading, representing that the goods shipped were in good order; and another in *Relyea* v. *Rolling Mill Co.* 42 Conn. 579, where the bill of lading represented that there was a larger quantity than was actually shipped, and libels to recover freight were dismissed. But see *Blanchet* v. *Powell,* 9 Exch. 74. But there being no goods delivered to the carrier, no agency to sign a bill of lading is called into being; indeed, there is no carrier, for there are no goods to be carried. There is a ship or a railroad, but it is not, as to any given person, a carrier without the goods, and it only as carrier that a bill of lading, in the nature of the thing, binds the company or owner.

The master of a ship has a more comprehensive agency than a station or freight agent of a railroad, and he has no authority, actual or apparent, to issue bills of lading until the goods are delivered to him or to the ship, and it took a statute in England to make him even personally liable to one injured by such bill of lading. 3 Kent, (12th Ed.) 207, and note; 1 Pars. Mar. Law, (Ed. 1859,) 135, 137, and notes; 1 Pars. Ship. & Ad. (Ed. 1869,) 187, 190, and notes; 2 Daniell, Neg. Inst. (2d Ed.) §§ 1729, 1733; 1 Chit. Cont. (11th Ed.) 7, note *e*; Hutch. Car. §§ 122, 123, 124; 2 Jac. Fish. Dig. 1654, and cases cited by these authorities; 18 & 19 Vict. *c.* 111, § 3; *Jessel*

v. *Bath*, 2 Exch. 267; *Brown* v. *Powell Col. Co.* 10 C. P. 562; *Grant* v. *Norway*, 10 C. B. 665; 70 Eng. Com. Law, 664.

These authorities establish beyond dispute that where a master signs a bill of lading for goods not received, or for more than are received, he acts beyond his authority, and the owner is not liable either to the original shipper or any assignee of the bill of lading, whether he makes advances on the faith of it or gives value for it or not; neither is the owner estopped to show the facts as they really exist. Some courts have reluctantly yielded to this principle, and some have sought to restrict or qualify it in the supposed interest of commercial dealing; but in England, although a statute makes the individual signing the bill of lading liable, it goes no further, and the doctrine of *Grant* v. *Norway*, *supra*, has withstood the assaults upon it and is established law. It has been approved by the supreme court of the United States, and directly or in principle by other federal courts. *Schooner Freeman* v. *Buckingham*, 18 How. 182; *Vandewater* v. *Mills*, 19 How. 90; *The Lady Franklin*, 8 Wall. 325; *The Keokuk*, 9 Wall. 517, 519; *Buckley* v. *Naumkeag Co.* 24 How. 386, 392; S. C. 1 Cliff. 322, 328; *The Loon*, 7 Blatchf. 244; *The Grant*, 1 Biss. 193; *The May Flower*, 3 Ware, 300; *The Edwin*, 1 Sprague, 477; *The Leonidas*, 1 Olc. 12; *The Marengo*, 6 McLean, 487; *McCready* v. *Holmes*, 6 Am. Law Reg. (O. S.) 229; *The Brown*, 1 Biss. 76; *The Wellington*, Id. 279, 280; *The Tuskar*, 1 Sprague, 71; *Sutton* v. *Kettle*, Id. 309; *Blag* v. *Ins. Co.* 3 Wash. 5; *Dixon* v. *Railroad Co.* 4 Biss. 137, and note at page 147; *Bradstreet* v. *Heran*, 2 Blatchf. 116; *Relyea* v. *Rolling Mill Co.* 42 Conn. 579.

It must be conceded, as is contended here, that none of these cases were against railroad companies—the case of *Dixon* v. *Railroad Co.*, *supra*, being cited only for the note as a collection of authorities; and in the *Lady Franklin*, *supra*, *Relyea* v. *Rolling Mill Co.*, *supra*, *Bradstreet* v. *Heran*, *supra*, there are intimations, and in two of them something more than intimations, perhaps, that the rule might be different where the case is embarrassed by advances being made on the faith of the bill of lading. But it is thoroughly settled that there is no distinction between a bill of lading given by a carrier on land and one given by a carrier on water. Mr. Justice Story says as much, and that "each means the same obligation and liabilities, and is subject to the same duties." *King* v. *Shepherd*, 3 Story, 349, 360. The learned annotators of *Lukbarrow* v. *Mason*, 2 T. R. 63, (S. C. 6 East, 21,) say:

"It has, indeed, been questioned whether a receipt given by a carrier for goods or merchandise placed in his hands for transportation from one part of the same country to another, along the line of a canal or railroad, is a bill of lading in the sense of the commercial law, or within the rule of *Lickbarrow* v. *Mason*. But this doubt has but little foundation in reason, and is impliedly excluded by the decisions in this country, which treat the legal effect of instruments of this description as the same, whether the property which they represent is carried by land or across the ocean." 1 Smith, Lead. Cas. (7th Ed.) 1205, marg. p. 900. See, also, 2 Daniell, Neg. Inst. (2d Ed.) § 1732; 1 Parsons, Ship. & Adm. 134; Bouv. Law Dict. tit. "Bill of Lading," and cases cited.

The argument of learned counsel for the plaintiffs, that this exemption of the owner of a ship from liability for the fraud of the master in issuing a false bill of lading grows out of the peculiarities of the laws of the sea, and is founded on the principle that the ship is bound to the freight and the freight to the ship, is a misapprehension, I think, of the meaning of the supreme court in *The Schooner Freeman Case*, for the court distinctly places its judgment as well upon the want of authority in the master as an agent. See *The Williams*, 1 Brown, Adm. at p. 219; *The Pauline*, 1 Biss. 390.

And in respect to the intimations that there is a different rule between an assignee who has in good faith advanced money on the faith of the bill of lading and the original parties, I can only say that, in my judgment, no such distinction exists. These intimations are all founded on doubts and conflicts that were set at rest by *Grant* v. *Norway*, which is a direct authority against them. *The Schooner Freeman Case* approves that of *Grant* v. *Norway*, was itself a case of advancement of money on the faith of a false bill of lading, and must bind us here, both in its principle and its precedent. Besides, I have no doubt, for the reasons I have stated, that it is the correct principle, and it is a mistake to suppose that the interests of commerce require that the common carriers of the country shall become the insurers or guarantors of merchants who choose to make, in their dealings with each other, a convenience of their bills of lading.

It is proper that I should give attention to the conflict of authority in the state courts, though in this matter of general commercial law I should feel at liberty to act independently, without attempting to reconcile the conflict, and follow the guidance that seems to me plainly pointed out by the federal adjudications I have consulted. The New York commission of appeals has deliberately overruled both the courts of England and the supreme court of the United States, though the lamented author of Hutchinson on Carriers seems

to distinguish the case, and the court itself somewhat relies upon the distinction; and the responsibility for any want of uniformity on the subject must rest on that court. *Armour* v. *Mich. Cent. R.* 65 N. Y. 111; Hutch. Car. § 124. The supreme court of Kansas adopts this view of the New York court in the case of *Savings Bank* v. *Railroad*, 20 Kans. 519. On the other hand, the supreme courts of Maryland, Louisiana, Missouri, Massachusetts, and Ohio sustain *Grant* v. *Norway* and *The Schooner Freeman Case* in opinions that are instructive and conclusive to my mind. There may be other cases on both sides, but these are sufficient for the present purpose. I find no Tennessee case on the subject, and it is proper to say that the decision in Maryland to which I refer inspired a statute since passed to make bills of lading negotiable, the effect of which upon the principle we are considering has not been determined. *Balt. & Ohio R.* v. *Wilkins*, 44 Md. 11; *Tiedman* v. *Knox*, 53 Md. 612, 615; *Fellows* v. *Powell*, 16 La. Ann. 316; *Adams* v. *Trent*, 19 La. Ann. 262; *Hunt* v. *Miss. Cent. R.* 29 La. Ann. 446; *La. Nat. Bank* v. *Lavielle*, 52 Mo. 380; *Dean* v. *King*, 22 Ohio St. 118; *Sears* v. *Wingate*, 3 Allen, 103; 1 Meigs' Dig. (Tenn. 2d Ed.) p. 384, § 396; Id. p. 411, § 420, subs. 3.

The Massachusetts case formulates the rules of law on this subject, the third of which says:

"When the master is acting within the limits of his authority the owners are estopped in like manner with him; but it is not within the general scope of the master's authority to sign bills of lading for any goods not actually received on board."

A question is made by the defendant that the plaintiffs cannot sue in their own name because it is contended that the assignment of a bill of lading goes no further than to give the assignee a right to bring replevin or trover for the goods or some action connected with his ownership, and does not assign the right to bring an action for a breach of the contract of affreightment. This was never so in our admiralty courts, though for a long time such was the contention in courts of law. But now, as the authorities already cited and numerous others show, the assignment carries the right to bring an action against the carrier for loss or non-delivery. This would be certainly so under the influence of our Code, which makes all bills for the performance of any duty assignable, and our decisions collected in Meigs' Digest at the places above cited. T. & S. (Tenn.) Code, § 1967; *The Thames*, 14 Wall. 98; S. C. 3 Ben. 279; 7 Blatchf. 226; *The Vaughan and Telegraph*, 14 Wall. 258; *Curry* v. *Roulstone*, 2 Tenn.

110; *Newcomb* v. *Boston, etc., R.* 115 Mass. 230; *Merchants' Bank* v. *U. R. Co.* 69 N. Y. 373; 1 Am. Lead. Cas. (4th Ed.) 323; 1 Smith, Lead. Cas. (7th Ed.) 816; Id. 1147, 1227; Hutch. Car. §§ 720, 737; 2 Daniell, Neg. Inst. *c.* 54.

Demurrer overruled.

NOTE. The writer of this opinion cannot resist an impulse of affectionate remembrance, and begs the privilege of adding here a word of admiration for the thorough, careful, and able work of his deceased friend, Robert Hutchinson, the author of the treatise on "Carriers," above referred to, who died in the great plague of yellow fever that desolated Memphis in 1878. Often—very often—while he was engaged in the preparation of that book, have we labored together in the late hours of the night in the library where the writer at this moment works alone beside the silent but enduring monument his dead friend has left.